Filed 7/2/15

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

THE PEOPLE,

      Plaintiff and Respondent,

v.

GREGORY JEFFERSON,

      Defendant and Appellant.

A139007

(Alameda County
Super. Ct. No. C170682)

      On January 18, 2012, Officer Anthony Tedesco observed defendant and appellant Gregory Jefferson placing an item—later determined to be a loaded and stolen firearm—under the driver's seat of a gray Bentley that Jefferson had driven to the location. Jefferson then left that location in another car, as a passenger. At Tedesco's request, that second car was stopped and Jefferson was found in possession of a second firearm that was legally registered to him. Approximately one year later, Jefferson was observed by a different officer exiting the same gray Bentley and placing a bag in the trunk of that vehicle. A subsequent search revealed a third firearm in that bag, also legally registered to Jefferson.

      Based on the stolen firearm concealed in the Bentley, Jefferson was charged with carrying a concealed firearm within a vehicle and carrying a loaded firearm in public. At trial, the court permitted the prosecution to introduce evidence of Jefferson's possession of the two legally registered firearms to prove he had control over the charged firearm and to prove his knowledge that firearm was stolen. In the published portion of this

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.C and II.D.

1

opinion, we conclude the court abused its discretion in failing to exclude the registered firearms evidence. The error was harmless, except with respect to the jury's true findings on special allegations on both counts that Jefferson had reasonable cause to believe the charged firearm was stolen. We reverse the true findings on those special allegations, and affirm in all other respects.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Jefferson was charged, by information, with carrying a concealed firearm within a vehicle (Pen. Code, § 25400, subd. (a)(1); count one)[1] and carrying a loaded firearm on one's person in a city (§ 25850, subd. (a); count two). With respect to count one, it was alleged the firearm was stolen and Jefferson knew or had reasonable cause to believe it was stolen. (§ 25400, subd. (c)(2).) It was further alleged the firearm was loaded and not registered to Jefferson. (§ 25400, subd. (c)(6).) With respect to count two, it was alleged that the firearm was stolen and Jefferson knew or had reasonable cause to believe it was stolen (§ 25850, subd. (c)(2)), and that the firearm was not registered to Jefferson (§ 25850, subd. (c)(6)).

At trial, Oakland Police Officer Anthony Tedesco testified that, on January 18, 2012, around 6:00 p.m., he was conducting undercover narcotics surveillance on 64th Avenue Place in Oakland. Using binoculars, Tedesco observed a man later identified as Jefferson drive a gray Bentley to the dead-end street, park about 30 yards away from Tedesco, and remain seated in the car for around 20 minutes before exiting and walking across the yard of a nearby house. As Jefferson approached the front door of the house, Tedesco lost sight of him for a minute or two. During that time, Tedesco heard a door open and close and the sound of a small metal object being dropped on what sounded like sheet metal.

Jefferson came back into view as he returned to the Bentley. At the same time, a green Porsche Cayenne sport utility vehicle drove up the street, made a u-turn, and stopped alongside the Bentley. Jefferson walked up to the Porsche, spoke to its

---

[1] Undesignated statutory references are to the Penal Code.

occupants, entered the Porsche for a minute or two, and then returned to the Bentley while carrying something under his shirt.  According to Tedesco, Jefferson carried the item "very gingerly," as though it were important.  Based on his experience and training and the size of the object being carried, Tedesco believed the object was a handgun.  Jefferson opened the Bentley's driver door, bent down underneath the steering wheel, and appeared to push something under the driver's seat.  Jefferson then walked back to the Porsche, entered the backseat, and the Porsche drove away.

Tedesco reported this activity to nearby uniformed officers and asked those officers to make an investigative stop of the Porsche.  Oakland Police Officer Jeffrey Smoak discovered that the Porsche had an expired registration and pulled it over within blocks of 64th Avenue Place.  When the car stopped, Smoak approached and asked the driver to roll down the window.  When the driver complied, Smoak smelled the fresh odor of marijuana coming from inside the car.  Smoak observed that the driver and the passenger behind the driver were men, while the two passengers on the right side of the car were women.  When Smoak smelled the marijuana, he also saw that the rear left passenger—later identified as Jefferson—was bent over and moving one hand by his waist.  Concerned that Jefferson was armed, Smoak instructed him to put his hands on the seat in front of him.  Jefferson complied.

The driver was discovered to be on probation and detained.  Jefferson then dropped his hands off the seat in front of him.  Smoak asked Jefferson to exit the vehicle and, when Jefferson did so, Smoak saw on the seat where Jefferson had been sitting an ammunition magazine containing eight rounds.  Smoak handcuffed Jefferson and conducted a pat search to check for weapons.  As Jefferson was pat-searched, a lower receiver for a Glock pistol dropped from his pants.  The upper receiver to the pistol, with matching serial numbers, was found in Jefferson's waistband.  The gun was a Glock 27 semiautomatic pistol, which was legally registered to Jefferson.  Smoak also found $1,785 in cash on Jefferson, a "fist sized" baggie of marijuana on one of the two female passengers, a small digital scale that had marijuana residue on it, and gallon-sized baggies.

Based on what was found inside the Porsche and Tedesco's prior observations, Smoak obtained a search warrant for the Bentley. Oakland Police Officer Billy Matthews searched the Bentley. Matthews discovered a loaded nine-millimeter Sig Sauer firearm underneath the floor mat on the driver's side floorboard. Matthews also found a picture of Jefferson in the glove compartment. Jefferson was arrested. Keys to the Bentley were later recovered from the mailbox of the house Jefferson had approached.

The parties stipulated that the Glock firearm was registered to Jefferson and that the Sig Sauer nine-millimeter pistol was registered to Stanley Toy, a former Daly City police officer. Toy testified that two guns had been stolen from the trunk of his car in 2007, one of which was a nine-millimeter Sig Sauer. Toy recognized the gun that had been seized from the Bentley because it had the same serial number and sights he had installed.

About a year after the events observed in Oakland, on January 1, 2013, San Francisco Police Officer Charles Simpson noticed a gray Bentley with no license plates parking on a street in San Francisco. He observed the driver, who was later identified as Jefferson, get out with a tan bag, move to the rear of the car, open the trunk, put the bag in, and then close the trunk. Simpson later searched the car and found a tan backpack containing a nine-millimeter firearm and 10 live rounds in an unlocked gun box in the trunk. The gun was legally registered to Jefferson. The car had the same vehicle identification number as the Bentley previously searched in Oakland.

Jefferson did not present any witnesses in his defense.

The prosecutor argued, in closing argument: "The [gun] found on [Jefferson] is not charged. I won't get into the reasons for that, but essentially it's not put together in an operable way. . . . However, the issue in this case is the stolen gun, the one found in the [Bentley]. That's what you're being asked to decide, whether he was in possession of that." Defense counsel's closing argument made clear that, with respect to count one, Jefferson conceded that the Sig Sauer was found in the Bentley on January 18, 2012, but contended that the People had not met their burden to show that Jefferson controlled the

4

car,[2] knew of the gun's presence, or knew the gun was stolen.  Furthermore, Jefferson's counsel argued that Tedesco's identification was not credible because "he couldn't tell anything about what [Jefferson] was wearing, how he looked."[3]

The jury returned guilty verdicts as to both counts and found the additional allegations true.  The trial court suspended imposition of sentence on count one, placed Jefferson on five years' probation, and ordered him to spend the first year in county jail.  Punishment on count two was stayed pursuant to section 654.  Jefferson filed a timely notice of appeal.

## II.    DISCUSSION

On appeal, Jefferson argues that the trial court erred by:  (1) admitting evidence of his two uncharged firearm possessions; (2) failing to instruct the jury that a police officer's testimony should be judged by the same standards applicable to other witnesses; and (3) allowing the prosecutor to improperly vouch for the testifying officers' credibility.  We reverse the jury's true findings on the special allegations based on Jefferson's knowledge that the firearm was stolen, but otherwise affirm.

A.    *Statutory Scheme*

Section 25400 provides, in relevant part:  "(a) A person is guilty of carrying a concealed firearm when the person does any of the following: [¶] (1) Carries concealed within any vehicle that is under the person's control or direction any pistol, revolver, or other firearm capable of being concealed upon the person. [¶] . . . [¶] (c) Carrying a concealed firearm in violation of this section is punishable as follows: [¶] . . . [¶] (2) *If the firearm is stolen and the person knew or had reasonable cause to believe that it was*

---

[2] On cross-examination, Tedesco testified he thought the Bentley had dealer plates.  He also testified the registered owner of the Bentley was eventually determined to be Moda Auto Lounge—a car dealership that rents and sells high-end vehicles.

[3] On cross-examination, Tedesco testified it was getting dark when he made his observations; he did not remember if street lights were on, whether either the Bentley or Porsche had tinted windows, or what jewelry the Bentley driver was wearing; he did not write a police report; he did not provide a facial description of the driver or notice any scars or tattoos; and he did not see how many people were in the Porsche.

5

*stolen, as a felony*. [¶] . . . [¶] (6) If both of the following conditions are met, by imprisonment pursuant to subdivision (h) of Section 1170, or by imprisonment in a county jail not to exceed one year, by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment: [¶] (A) The pistol, revolver, or other firearm capable of being concealed upon the person is loaded, or both it and the unexpended ammunition capable of being discharged from it are in the immediate possession of the person or readily accessible to that person. [¶] (B) The person is not listed with the Department of Justice pursuant to paragraph (1) of subdivision (c) of Section 11106 as the registered owner of that pistol, revolver, or other firearm capable of being concealed upon the person. [¶] (7) In all cases other than those specified in paragraphs (1) to (6), inclusive, by imprisonment in a county jail not to exceed one year, by a fine not to exceed one thousand dollars ($1,000), or by both that imprisonment and fine." (Italics added.) In other words, a violation of section 25400 is a felony offense under subdivision (c)(2), a misdemeanor offense under subdivision (c)(7), and an alternate felony/misdemeanor, commonly known as a "wobbler" offense, under subdivision (c)(6).

Section 25850, subdivision (a) provides: "A person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory." Subdivision (c) of section 25850 is substantively identical to subdivision (c) of section 25400 except the phrase "concealed firearm" is replaced with "loaded firearm."[4] As with section 25400, section 25850 may be a felony, a misdemeanor, or a wobbler depending on the circumstances.

Accordingly, the People had to prove on count one, inter alia, that Jefferson "carried concealed within a vehicle *under his/her control or direction* a pistol, revolver, or handgun" and that he "had knowledge of the presence of the pistol, revolver or

_____

[4] Of course, section 25850, subdivision (c)(6) does not separately require that the firearm be loaded, as is required in section 25400, subdivision (c)(6)(A), because section 25850 only relates to loaded firearms.

6

handgun." (CALJIC No. 12.46, italics added; § 25400, subd. (a)(1).) Similarly, the People had to show on count two, inter alia, that Jefferson "carried a loaded firearm on his person" and "had knowledge of the presence of the firearm." (CALJIC No. 16.470; § 25850, subd. (a).) In order to subject Jefferson to felony punishment, the jury had to find that the firearm was stolen and that Jefferson "knew or had reasonable cause to believe that it was stolen." (§§ 24500, subd. (c)(2), 25850, subd. (c)(2).)

B.      *Other Firearms Evidence*

Jefferson contends that the trial court abused its discretion and denied him due process in admitting, under Evidence Code section 1101, subdivision (b), evidence of his possession of the Glock in 2012, as well as the nine-millimeter firearm found in the Bentley's trunk in 2013. He argues the trial court should have excluded this evidence because it was irrelevant (Evid. Code, § 350), constituted inadmissible character evidence (*id.*, § 1101), or, alternatively, its probative value was substantially outweighed by the potential for undue prejudice (*id.*, § 352).[5] " 'Rulings made under [Evidence Code sections 1101 and 352] are reviewed for an abuse of discretion. [Citation.]' [Citation.]

---

5 Evidence Code section 350 provides: "No evidence is admissible except relevant evidence."

Evidence Code section 1101, subdivision (a), provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." But, Evidence Code section 1101, subdivision (b), provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329.)

1.    *Background*

Prior to trial, the prosecution gave notice that it intended to introduce evidence of Jefferson's 2013 contact with police, pursuant to Evidence Code section 1101, subdivision (b), to prove Jefferson's intent and absence of mistake. Specifically, the prosecutor argued: "[I]f the uncharged act illuminates [Jefferson's] control of the vehicle and absence of mistake at the time he committed the other offense, it may logically tend to show [Jefferson's] control of the vehicle and absence of mistake when he committed the charged offenses. . . . [¶] The similarities between the uncharged offenses satisfy the requirements of Evidence Code section 1101(b) and warrant their admission into evidence. They both show his ownership and control of the Bentley." Jefferson's trial counsel moved in limine to exclude the evidence, as well as "[a]ny mention of the officers' recovery [in 2012] of [Jefferson's] lawfully possessed firearm."

At argument on the motions, the prosecutor stated: "I think the gist of the argument is that the proposed testimony of one or two San Francisco police officers regarding [Jefferson] driving the same vehicle that . . . was searched as a part of this case in January of 2012 . . . . I'm not even sure as I read it it's really an 1101(b) because the thrust of the testimony is going to be his connection to the car, which in and of itself isn't illegal in any way.[6] It's not other crimes evidence, although he was arrested for having a handgun in his possession. [¶] What the San Francisco report says, in addition to what I've stated here, is he gets out of the driver's seat with a backpack and the police watch

---

[6] It is worth noting that an uncharged act need not be a criminal offense to be subject to the limitations contained in Evidence Code, section 1101. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1100; see § 1101, subd. (b) ["Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, *or other act* when relevant . . . ."], italics added.)

him put it in the trunk. When they search the car pursuant to an inventory search, they find the backpack that has the gun in it, although not loaded. The testimony will be about the connection to the vehicle to show that he's in control of the same vehicle that the gun was found in January of 2012. [¶] So it's other evidence as far as contact with the police, but the People's argument would be [that it] is to show that this wasn't just a random car he had no connection to on one day in January of 2012. The fact that he's driving the same exact vehicle nearly 12 months later shows his connection to the vehicle." In response, Jefferson's trial counsel contended that intent was not at issue, the acts were completely dissimilar, and the evidence's potential for prejudice outweighed its probative value. Defense counsel also stated: "If the Court was to allow any evidence regarding the San Francisco matter, I would request the Court to limit it solely to the fact that they observed my client driving a Bentley that day . . . ."

The trial court ruled that the 2013 evidence was admissible, stating it had "looked at the probative value versus prejudicial effect." Then, specifically mentioning both the Glock and the firearm found in San Francisco, defense counsel asked the court to reconsider its ruling. The court declined, stating, "[i]n this particular case it's clear the connection between the weapons found, the intent, et cetera."

2. *Analysis*

" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) " 'Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. (Evid. Code, § 1101.) Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of

9

identity, common design or plan, or intent. ' " (*People v. Foster, supra,* 50 Cal.4th at p. 1328.)

" 'The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 22; accord, *People v. Nible* (1988) 200 Cal.App.3d 838, 847.) "In determining relevance, the trial court must look behind the label describing the kind of similarity or relation between the other offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong." (*People v. Schader* (1969) 71 Cal.2d 761, 775.)

"Even where such evidence is relevant for other purposes . . . evidence of other crimes 'contains within itself a substantial degree of prejudice [and] should be received with "extreme caution," its admissibility "examined with care," and in the event of uncertainty as to its connection with the offense charged "the doubt should be resolved in favor of the accused." ' " (*People v. Holt* (1984) 37 Cal.3d 436, 451.) "The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)

Jefferson argues the trial court erred because "[e]vidence of the gun[s] admitted here was not related to the charged crime. The only reason for admitting [them] was to paint [Jefferson] as a person who 'surrounded himself' with guns, a fact that was not relevant to determining whether he intentionally concealed a gun known to be stolen in the Bentley." In admitting the evidence below, the court stated, "In this particular case it's clear the connection between the weapons found, the intent, et cetera." On appeal, the People make only minimal effort to justify admission of the disputed evidence on the

10

ground that it is relevant to intent.[7]  Instead, they primarily argue that possession of the two firearms was relevant to show control of the Bentley and knowledge that the Sig Sauer was stolen.[8]  To wit, the People argue:  "[T]he preciseness of the similarity between 2012 and 2013 rests in the vehicle, not in the weapon.  On both occasions, [Jefferson] was driving precisely the same vehicle and exerting control over it by depositing items in his possession in the vehicle and leaving them there.  Therefore, the type of inference that the prosecutor urged was . . . that the use of the same vehicle on both occasions reflects [Jefferson's] control over the vehicle . . . .  Moreover, the prosecutor specifically explained that the gun from 2013 was being used to show that [Jefferson] knows about the legal requirements of registering a gun and therefore would have known that the gun that he had hidden in the Bentley in 2012 was not properly registered to him."

Jefferson's closing argument and his cross-examination of Tedesco—revealing that the Bentley was registered to a car dealership—made clear that Jefferson disputed his

---

[7] The People argue that "[e]vidence of the gun registered in his name establishes that [Jefferson] not only drives the Bentley, but also has control over the trunk of the Bentley.  The fact that he used the trunk of the Bentley to store his possessions there demonstrates the requisite general intent–that on both occasions where he stored an object in the Bentley, he was aware of his own control over the Bentley."  This argument is difficult to follow.  " 'A crime is characterized as a "general intent" crime when the required mental state entails only an intent to do the act that causes the harm; a crime is characterized as a "specific intent" crime when the required mental state entails an intent to cause the resulting harm. ' "  (*People v. Atkins* (2001) 25 Cal.4th 76, 86.)  The fact that Jefferson had placed a lawfully possessed gun in the trunk of the Bentley in 2013 may tend to make it more likely that, in 2012, he concealed the gun in his car intentionally.  But, Jefferson never contends he did so unintentionally.

[8] Although the knowledge argument was not raised at the in limine stage, the prosecutor raised these arguments in his closing:  "[Jefferson is] driving that car a year later, not just that day.  [¶] . . . [¶] . . . [The Sig Sauer is] a stolen gun. . . . [Jefferson] knows how to register a gun.  Now, this is important because [Jefferson] obviously was able to purchase a gun and register it . . . .  Two guns; the one from San Francisco and the one that was actually found on him disassembled and inoperable . . .  But the fact that he knows how to lawfully obtain a weapon is really good evidence that he knows when he has unlawfully obtained a gun."

11

control of the Bentley. We agree with the People that the fact that Jefferson was seen driving the same Bentley a year later suggests the Bentley was under Jefferson's control on January 18, 2012. This conclusion is strengthened by the fact that Jefferson placed a bag in the vehicle's trunk in 2013. However, the precise nature of any object found in the bag, whether a football or a firearm, adds nothing. Driving a car and accessing the car's trunk to store a bag, even if the bag is empty, demonstrates control. The contents of the bag, if any, have no tendency in reason to prove or disprove control over the vehicle. Further, Jefferson's lawful possession of a firearm at the time of his 2012 arrest has no tendency to prove he was in control of the Bentley earlier that evening. Thus, without regard to the restrictions on admissible evidence imposed by Evidence Code sections 1101(b) and 352, the challenged evidence should not have been admitted to establish Jefferson controlled the Bentley.

Regarding Jefferson's knowledge the charged firearm was stolen, the People argue that the fact that Jefferson has possessed legally registered guns—both the firearm found in the Bentley in 2013 and the Glock found on his person in 2012—demonstrated Jefferson knew how to legally acquire firearms and should have known the charged firearm was stolen. However, this chain of logic is impaired by the absence of any stipulation by the parties or instruction by the trial court explaining the details of the applicable California and federal firearm laws. Such a stipulation or instruction might have enabled the jury to make inferences from the fact that Jefferson possessed firearms registered in his name, including potentially inferences about how acquisition of the registered firearms differed from acquisition of the charged firearm. Those inferences might have tended to prove Jefferson should have known the charged firearm was stolen. But, absent information about firearm laws, the jury was left to speculate about the significance of Jefferson's posession of registered firearms. And " '[s]peculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose.' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 681.)

12

Even if the trial court did not abuse its discretion in concluding the registered firearm evidence was relevant to show Jefferson's knowledge the charged firearm was stolen, the court abused its discretion in failing to exclude the evidence under Evidence Code, section 352. The required analysis compares the probative value of the evidence and the probability of undue prejudice;[9] here, the former is substantially outweighed by the latter. Though arguably relevant, the probative value of the evidence that on two occasions Jefferson possessed registered firearms in establishing that Jefferson knew the charged firearm had been stolen is vanishingly slight. First, as discussed above, the logical chain connecting the challenged evidence to the disputed issue is so attenuated as to be almost speculative. In addition, the circumstances surrounding appellant's acquisition of the weapon—on the street, from inside another car—and his obvious attempt to conceal it on his person and in the Bentley are much stronger evidence that Jefferson knew it was contraband. Though these circumstances are hardly conclusive that he knew the charged firearm was stolen, the evidence he also possessed registered firearms adds next to nothing to them.[10]

On the other hand, evidence that Jefferson possessed firearms on other occasions unduly prejudiced him. "The 'prejudice' referred to in Evidence Code section 352

---

[9] " ' [A] court need not expressly weigh prejudice against probative value or even expressly state that it had done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." (*People v. Lewis* (2009) 46 Cal.4th 1255, 1285.) However, it is almost always a better practice for trial courts to expressly engage in this weighing process, if for no other reason than to assist in appellate review. (*People v. Paniagua* (2012) 209 Cal.App.4th 499, 518.)

[10] The People also assert in passing that evidence of Jefferson's 2012 possession of the Glock was relevant and admissible in order to "explain how the police became suspicious enough of the Bentley to obtain a search warrant and investigate it." While in certain limited circumstances such evidence might be relevant at trial or in resolving a motion to suppress, the People fail to explain why the basis for the search warrant was an issue of such importance in the present case as to outweigh the potential for undue prejudice to Jefferson. Moreover, Tedesco's observations of the Bentley and the other contraband and suggestive evidence found in the Porsche were sufficient to justify the investigation of the Bentley, without evidence of the Glock.

applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) The statute is not directed at " ' "the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." ' " (*People v. Harris* (1998) 60 Cal.App.4th 727, 737.) But the registered firearms evidence was not highly probative and it prejudiced Jefferson primarily by painting him as a dangerous person in a dangerous neighborhood probably engaged in a dangerous profession, drug dealing. "Exclusion of evidence under Evidence Code section 352 is reserved for those cases where the proffered evidence has little evidentiary value and creates an emotional bias against the party." (*Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, 1613.) This is such a case.

Simply establishing the court erred is not enough. To prevail on appeal, Jefferson must demonstrate the error was prejudicial under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Mullens* (2004) 119 Cal.App.4th 648, 659.) "Under the *Watson* standard, prejudicial error is shown where ' " 'after an examination of the entire cause, including the evidence,' [the reviewing court] is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." [Citation.] "We have made clear that a 'probability' in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*" ' " (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050; accord, *People v. Wilkins* (2013) 56 Cal.4th 333, 351.) With respect to the pertinent special allegations attached to counts one and two, the evidence Jefferson knew or should have known the charged firearm had been stolen was entirely circumstantial and far from overwhelming. And any question as to the emotional bias produced by the evidence was removed in the prosecutor's closing argument: "I don't want to be unfair to anybody right now . . . . But . . . [w]e're talking about $100,000 cars, 1,000 or almost $2,000 in small denominations, hundreds, 20's. We're talking about drugs, marijuana coming out. I won't call it a hard drug, but illegal to have. We're talking about a bad area. Talking about not just one gun, but two guns. And the gun that's found on [Jefferson], . . . I don't

14

think it's a recreational casual gun. [¶] What do you need this for? 28 rounds. The regular 12 or 13 is not enough? Live bullets and the gun. . . . It doesn't look all that innocent. Menacing. . . . You have to make sure you don't have to reload. I mean, ladies and gentlemen, this is what makes us worry about our kids walking to school. This is what makes areas have bad reputations. This is what should be taken off the street. " Under *Watson,* the jury's true findings on the section 25400, subdivision (c)(2) and section 25850, subdivision (c)(2) special allegations must be reversed.

As to the two substantive offenses, it is a much closer question. The defense vigorously disputed whether Jefferson possessed the charged firearm, principally by challenging Tedesco's identification of him as the person who placed it under the driver's seat of the Bentley. But, in addition to the officer's identification, Jefferson was located in the Porsche when that car was stopped. Jefferson's picture was found in the Bentley in the same search that revealed the charged firearm. And one year later he drove the identical Bentley in San Francisco. The compelling nature of this evidence leads us to conclude there is no "reasonable chance" that the jury would have reached a different verdict on counts one and two had Jefferson's challenge to the registered firearm evidence been sustained. Thus, the error in admitting this evidence does not require reversal of the convictions on those counts. Neither is there a basis to conclude the error in admitting the registered firearms evidence affected the jury's true findings on the section 25400, subdivision (c)(6) and section 25850, subdivision (c)(2) special allegations, which were based on the undisputed circumstances that the firearm was loaded and registered to someone other than Jefferson.

C.      *Jury Instruction Regarding Police Testimony*

Next, Jefferson argues we should reverse the convictions on counts one and two because the trial court erred by failing to instruct the jury that testimony given by police officers was to be weighed and judged according to the same standards applicable to other witnesses. Although he concedes his trial counsel did not request such an instruction, Jefferson contends the court had a sua sponte duty to so instruct because

15

"[d]efense counsel focused on the limits of [the officers'] testimony and its inconsistencies."

"[I]t is well settled that no objection is required to preserve a claim for appellate review that the jury instructions omitted an essential element of the charge." (*People v. Mil* (2012) 53 Cal.4th 400, 409.) However, no such omission occurred here. A police officer's testimony is to be judged by the same standard that applies to the average witness. (*People v. Hanna* (1939) 36 Cal.App.2d 333, 337.) Consistent with this principle and CALJIC No. 2.20, the jury was instructed that "[e]very person who testifies under oath or affirmation is a witness" and that it may consider "[t]he existence or nonexistence of a bias, interest, or other motive" and "[t]he attitude of the witness toward this action or toward the giving of testimony." " 'A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal . . . .' " (*People v. Whalen* (2013) 56 Cal.4th 1, 81–82.) Thus, by failing to request any additional instruction or clarification, Jefferson's claim of instructional error was forfeited. Even assuming Jefferson could assert the alleged instructional error because it affects his substantial rights (§ 1259; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103, fn. 34), he can show no error.

Jefferson's reliance on *People v. Cummings* (1993) 4 Cal.4th 1233 (*Cummings*) is misplaced. In *Cummings,* a courtroom bailiff testified regarding incriminating statements made by the defendant while in a holding cell. (*Id.* at pp. 1266, 1289.) The defendant objected, arguing that "admitting the testimony of a trusted court officer, who had been involved in seating and escorting the jurors and relaying juror messages to the court, would deny due process and a fair and impartial trial." (*Ibid.*) The Supreme Court concluded that the trial court did not err in admitting the testimony: "[The courtroom bailiff] had relatively little direct contact with members of the jury and was promptly relieved of his courtroom duties when he became a witness. *The jury was admonished that all witnesses' testimony was to be judged on the same basis and that no greater weight should be accorded to* [*the courtroom bailiff*] *because he had been a deputy in the*

16

*court*. Neither defendant's right to a fair trial, nor his right to jury trial was undermined by the admission of [the courtroom bailiff's] testimony." (*Id.* at pp. 1290–1291, italics added; see also *People v. Hill* (1998) 17 Cal.4th 800, 842–843 (*Hill*) [sua sponte instruction required that no artificial weight is to be given to the testimony of a witness who is also serving as a bailiff].) Here, there is no indication that the police officers who testified against Jefferson had any other interaction with the jury. Neither *Cummings* nor *Hill* suggest that any special instruction is required in the circumstances of the present case. Opinions are not authority for propositions not considered therein. (*People v. Avila* (2006) 38 Cal.4th 491, 566.)

D.      *Prosecutorial Misconduct*

Finally, Jefferson asserts that the prosecutor committed misconduct by vouching for the veracity of police officer witnesses. Specifically, he complains of the following statements made in the prosecutor's closing argument: "I was struck by how I think candid and honest and straightforward the officers were in this case." Later the prosecutor argued, "I don't see a reason to disbelieve any of the officers or what they saw. I think that you may agree [about] them being candid, them being honest about what they saw and didn't see . . . ."

"To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and, unless an admonition would not have cured the harm, ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct." (*People v. Martinez, supra,* 47 Cal.4th at p. 956.) Jefferson concedes that he did not raise a vouching objection at trial. An exception to the objection requirement may occur "when the 'misconduct [is] pervasive, defense counsel [has] repeatedly but vainly objected to try to curb the misconduct, and the courtroom atmosphere was so poisonous that further objections would have been futile.' " (*People v. Friend* (2009) 47 Cal.4th 1, 29.) "In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' " (*Hill, supra,* 17 Cal.4th at p. 820.) Neither exception applies here; accordingly, the misconduct claim has been forfeited.

Even if the claim was properly before us, we would conclude no improper vouching occurred. "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on a different ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)

"A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] Nor is a prosecutor permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial. [Citation.] However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching." (*People v. Frye, supra,* 18 Cal.4th at p. 971.)

We agree with the People that the circumstances here are similar to those in *People v. Ward* (2005) 36 Cal.4th 186 (*Ward*) and *People v. Huggins* (2006) 38 Cal.4th 175 (*Huggins*). In *Ward,* the prosecutor told the jury, " 'The only thing I have ever told [the People's witness] is to tell the truth, nothing but the truth, and that's what he did for you' and that another witness's testimony 'is the type of evidence I'm talking about that I am relying on in terms of being truthful, believable and credible evidence.' " (*Id.* at p. 216.) The court concluded that the prosecutor had done nothing more "than express[] his view of and reasonable inferences from the totality of the evidence." (*Ibid.*) The court explained: " '*The fact that comments upon the testimony of certain witnesses made in an argument have been couched in the first person does not of itself render them improper*.' [Citation.] . . . Considered in context, this was no more than a comment on the relative

18

quality and strength of this witness in light of his identification of defendant as the shooter." (*Ibid*, italics added.)

In *Huggins, supra,* 38 Cal.4th 175, the prosecutor argued, " 'None of [the defendant's testimony] can be true. Please believe me. He has lied through his teeth in trying to sell this story to you.' " (*Id.* at p. 206.) The Supreme Court again found no misconduct: "It is not . . . misconduct to ask the jury to believe the prosecution's version of events as drawn from the evidence. Closing argument in a criminal trial is nothing more than a request, albeit usually lengthy and presented in narrative form, to believe each party's interpretation, proved or logically inferred from the evidence, of the events that led to the trial. It is not misconduct for a party to make explicit what is implicit in every closing argument, and that is essentially what the prosecutor did here." (*Id.* at p. 207.)

Similar to the arguments at issue in *Ward* and *Huggins,* the prosecutor's comments here, when considered in context, are nothing more than expressions of the prosecutor's reasonable inferences from the evidence. The prosecutor argued: "I don't know what the defense is going to be. . . . [In his opening statement, defense counsel] told you you're going to hear about people changing their testimony and mistakes and inconsistencies. [¶] I don't know what trial he was expecting, but I didn't see much of that. Maybe you did, maybe you didn't. . . . [¶] . . . You'll get an instruction from the Court . . . . It's going to tell you that . . . discrepancies in witness testimony or between two different witnesses, if any, do not necessarily mean that the witness should be discredited. Failure of recollection is common. Innocent misrecollection is not uncommon. . . . And this is the important part. Whether a discrepancy pertains to an important matter or only to something trivial should be considered by you. [¶] . . . I think we rely on police officers a lot in this world. We think that they should be completely mistake free. They should be perfect, not ever forget something or forget to write something important down in a police report. But we're talking about a situation that occurred . . . 15 months ago; . . . where officers are surveilling multiple different targets and people that day. . . . *I was struck by how I think candid and honest and straightforward the officers were in this*

19

*case.* [¶] [Defense counsel] told you at the beginning of the case that there was going to be . . . inconsistencies, that the stories were going to change over time. There's no evidence of that. . . . [T]here may have been a couple of moments . . . where there were questions like isn't it true you said such and such at the preliminary hearing, and he's like yeah, that sounds right. You know, isn't it true you said that? Well, yeah, sounds like the same that I'm testifying to today. Those aren't inconsistencies. And I think you can kind of draw a lot of honesty from that." (Italics aded.)

The prosecutor did not portray his office as privy to any information bearing on the officers' veracity that was not admitted at trial. He also did not impermissibly argue that, because he personally believed the officers, their testimony must be true. Most importantly, the prosecutor made clear that the jury should not simply rely on his view of the evidence, but should assess it independently.

E.       *Cumulative Error*

Finally, Jefferson argues the cumulative effect of the trial court's errors requires reversal of the judgment. We have concluded that only Jefferson's claim arising from admission of the registered firearms evidence has merit. There are no additional errors to cumulate with that error.

### III.    DISPOSITION

The judgment is reversed as to the true findings on the section 25400, subdivision (c)(2) special allegation on count one and the section 25850, subdivision (c)(2) special allegation on count two, and otherwise affirmed. The trial court is directed on remand to strike those true findings from the record of conviction and re-sentence appellant.

_____

SIMONS, J.

I concur.

_____

JONES, P.J.

(A139007)

BRUINIERS, J., Concurring and Dissenting

I share my colleagues' views in all but one respect. I would not find that the trial court abused its discretion in admitting evidence of Jefferson's legal possession of other firearms and affirm in all respects. I therefore respectfully dissent from the majority opinion to the extent that it holds otherwise.

The trial court, in finding the disputed evidence admissible, stated that it had "looked at the probative value versus prejudicial effect," and that "[i]n this particular case it's clear the connection between the weapons found, the intent, et cetera." The majority arrives at a different conclusion and finds that the trial court abused its discretion in admitting, under Evidence Code section 1101, subdivision (b) (section 1101(b)), evidence of Jefferson's possession of the Glock pistol in 2012, as well as the nine-millimeter firearm found in the Bentley's trunk in 2013. I do not.

*Probative Value*

The majority first discounts the relevance of the evidence. " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Jefferson's plea of not guilty put every element of the charged offenses at issue. (*People v. Lindberg* (2008) 45 Cal.4th 1, 23.) I find it difficult to say that personal possession of another firearm (albeit in pieces) and ammunition within moments of Tedesco's observations of Jefferson's activities in and around the Bentley was not probative of whether Jefferson "had knowledge of the presence" of the firearm later found in that vehicle. (Pen. Code, §§ 25400, subd. (a)(1), 25850, subd. (a); CALJIC Nos. 12.46, 16.470.) I would find the evidence was admissible as indicative of a common design, plan, or intent. (§ 1101(b).) The majority agrees that evidence of Jefferson placing a bag in the Bentley's trunk in 2013 was relevant to his control over the vehicle, but argues that evidence of the bag's contents has "no tendency in reason to prove or disprove control over the vehicle." Perhaps true, but the trial court could nevertheless reasonably conclude that Jefferson's placement of a *firearm* in the Bentley's trunk in 2013 is

1

probative of his knowledge of, and control of, the *firearm* found under the driver's side floor mat of that same vehicle in 2012.[1]

### *Prejudicial Effect*

I will assume, for purposes of this discussion, that the disputed evidence here was an "other act" subject to section 1101(b), even though neither incident involved evidence of a crime or civil wrong.[2] The trial court certainly treated it as such. Nevertheless, evidence relevant under section 1101(b) must be excluded only if probative value is substantially outweighed by the potential for undue prejudice (Evid. Code, § 352). Jefferson contends that evidence of other firearms posed a substantial danger of prejudice because a jury would be inclined to view those incidents of possession as evidence of criminal propensity and, as a result, view him as deserving of punishment regardless of his guilt on the counts charged. But the evidence presented here did not show other criminal offenses for which Jefferson was subject to punishment, or use of the firearms for any criminal purpose. Our Supreme Court has recognized that evidence of commission of *other crimes* has an inherent potential for prejudice, requiring " 'extreme

---

[1] The People also argue that the fact Jefferson possessed legally registered guns—the nine-millimeter firearm found in the Bentley in 2013 and the Glock found on his person in 2012—demonstrated Jefferson's knowledge of the registration requirement and, inferentially, his knowledge that the Sig Sauer found under the Bentley's floor mat was stolen. The majority first dismisses the People's contention that Jefferson's possession of registered firearms was relevant to his knowledge that the gun at issue here was stolen as speculative, but then concedes such possession was "arguably relevant." Since I would find the evidence admissible as to knowledge of the presence of the Sig Sauer in the Bentley on January 18, 2012, it is unnecessary to address this additional ground for admissibility.

[2] The majority cites *People v. McCurdy* (2014) 59 Cal.4th 1063, 1100 for the proposition that an uncharged act under section 1101(b) need not be a criminal offense. In *McCurdy,* the Supreme Court found that evidence of the defendant's prior sexual molestation of his sister, committed when he was under 14 years of age, was admissible under section 1101(b) as evidence of a "wrong or other act," even if it would not qualify as a "crime" under Evidence Code section 1108. (*McCurdy,* at p. 1100.) Since McCurdy's incestuous conduct was clearly a prior "wrong," the court had no occasion to consider the scope of section 1101(b)'s application to "other acts" not criminal or otherwise wrongful.

2

caution' " in determining admissibility. (*People v. Holt* (1984) 37 Cal.3d 436, 451; see also *People v. Lindberg, supra,* 45 Cal.4th at pp. 22–23.) While still subject to Evidence Code section 352 analysis, I submit that the calculus is necessarily different if the "other acts" are not themselves wrongful. I disagree that evidence of weapons lawfully possessed by Jefferson and not connected to any actual violence would share the same inherent prejudice as evidence of wrongful conduct. The disputed evidence was certainly no more inflammatory than the evidence of the charged offense.

In assessing prejudice, we must remember that "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

My colleagues would strike a different balance under Evidence Code section 352 than did the trial court. It would not have been unreasonable for the trial court to have reached a similar conclusion and excluded the evidence. I disagree, however, that it was *required* to do so. " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329.) The decision made here by the trial court in admitting the evidence was not arbitrary, capricious, or patently absurd, nor was it beyond the bounds of reason. (See *People v. Osband* (1996) 13 Cal.4th 622, 666 ["[a] court abuses its discretion when its

ruling 'falls outside the bounds of reason' "].)  In my view, no abuse of discretion has been shown.

_____

BRUINIERS, J.

A139007

Superior Court of Alameda County, No. C170682, Hon. Vernon K. Nakahara, Judge.


Thea Greenhalgh, under appointment by the Court of Appeal, for Defendant and Appellant.


Kamala D. Harris, Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Catherine A. Rivlin and Hanna Chung, Deputy Attorneys General, for Plaintiff and Respondent.