Filed 8/20/21  P. v. Holmes CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B305342 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA123468) |
| v. | |
| JOHN L. HOLMES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed in part and reversed in part.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant John L. Holmes appeals from the judgment following his conviction on 14 counts, including, inter alia, violation of a domestic relations court order, child abuse, robbery, criminal threats, and dissuading a witness by force or threat. Defendant contends his disruptive behavior during the proceedings below should have triggered an inquiry into his mental competence, that the evidence was insufficient to support one robbery count and the child abuse and criminal threats counts, and that the trial court erred by admitting evidence of an uncharged incident of domestic violence.

We conclude there was insufficient evidence of mental incompetence to require further inquiry by the trial court and defense counsel. The evidence was sufficient to support the robbery and criminal threats convictions; however, there was insufficient evidence that defendant had care and custody of the victims of the child abuse counts, a necessary element of those charges. The trial court properly admitted the evidence of the prior incident of domestic violence; the victim of that violence was also the victim of the count for witness dissuasion by force or threat, and the evidence of the prior incident was relevant and probative to that count.

Accordingly, we reverse the convictions for child abuse, but otherwise affirm the judgment.

## PROCEDURAL BACKGROUND

An information alleged 14 counts against defendant: two counts of violating a domestic relations court order (Pen. Code,[1]

---

[1] Unspecified statutory citations are to the Penal Code.

§ 273.6, subd. (a)) (counts 1–2); three counts of child abuse
(§ 273a, subd. (b)) (counts 3–5); two counts of second degree
robbery (§ 211) (counts 6–7); three counts of dissuading a witness
from prosecuting a crime (§ 136.1, subd. (b)(2)) (counts 8, 12–13);
one count of bringing contraband into jail (§ 4573, subd. (a))
(count 9); two counts of criminal threats (§ 422, subd. (a)) (counts
10–11); and one count of dissuading a witness by force or threat
(§ 136.1, subd. (c)(1)) (count 14).

The information further alleged that defendant had
suffered a prior serious or violent felony conviction, subjecting
him to sentencing under the "Three Strikes" law (§§ 667,
subds. (b)–(j), 1170.12) and a five-year enhancement under
section 667, subdivision (a)(1).

A jury convicted defendant of all 14 counts, and separately
found that he had suffered the prior conviction.

The trial court sentenced defendant to 37 years 8 months
as follows. The court set count 6 as the base term and sentenced
defendant to the high term of five years, doubled because of the
prior strike, and added five years for the enhancement under
section 667, subdivision (a)(1) for a total of 15 years. On counts
7 and 9 through 11, the court imposed one-third the midterm for
each, doubled, for a total of six years eight months, consecutive to
the base term. On counts 12 through 14, the trial court imposed
the full midterm on each, doubled, for a total of 14 years,
consecutive to the base term.[2] On counts 1 and 2, the trial court
imposed sentences of one year each, consecutive, and on counts
3 through 5, 180 days each concurrent with the other counts. The

---

[2] Section 1170.15 required imposition of the full middle
term for the violations of section 136.1 under the circumstances
of this case. Defendant does not contest this on appeal.

3

court imposed a sentence of three years on count 8, stayed pursuant to section 654.

The trial court imposed fines and fees, and awarded no custody credits because of a probation violation in a separate case. Defendant timely appealed.

## FACTUAL BACKGROUND

We summarize the evidence presented in support of the counts alleged in the information.

1. ***Violations of domestic relations court order and child abuse (counts 1–5)***

   a. **Issuance of domestic relations court order**

On September 25, 2018, the San Bernardino County Superior Court issued an order prohibiting defendant from having contact with or coming within 100 yards of Marcy D. (Marcy) for three years. This followed a June 3, 2018, incident in which, according to a 911 call and Marcy's statements to law enforcement at the time,[3] defendant entered her home, slapped her multiple times, dragged her by her shirt, took her phone, and stated he would return with a gun to kill her. Marcy identified defendant as her "ex." Defendant's alleged conduct was uncharged in the instant case.

---

[3] At trial, Marcy refused to answer most questions or claimed ignorance. Her statements summarized throughout this Factual Background section primarily were recounted through the testimony of police officers who took the statements, or presented to the jury through police body camera footage and recordings of 911 calls.

4

### b.    Violations of order and child abuse

On July 21, 2019, police responded to a call at Marcy's apartment.  Marcy lived with her three children, ages 10, 2, and a newborn.  Defendant, who was the newborn's father, had been staying there as well.

Marcy reported that the night before, she and defendant had argued because she wanted defendant to move out.  Around midnight, while she was lying in bed, defendant kicked her in the upper torso.  She went into the children's bedroom and slept there.

The next morning, the argument continued, and defendant put his hands around Marcy's neck and pushed her down onto her hands and knees.  Marcy left the apartment and went to the manager's apartment next door, leaving defendant alone with the children.[4]

When police officers arrived, Marcy told them the children were in the apartment but she did not have her key.  The officers found an unlocked side door and went in.  Defendant was not present.  The three children were inside, unattended.  They were nervous with the police there, but otherwise fine.

## 2.    *Robberies and first count of dissuading a witness (counts 6–8)*

The morning of August 16, 2019, Marcy called 911 and stated that defendant had "br[oken] into my apartment" and "t[aken] my phone."  The dispatcher asked if Marcy knew where

---

[4] In closing, the prosecution argued that defendant violated the protective order merely by being with Marcy on July 20 and 21, regardless of whether he assaulted her on those dates.

defendant lived and Marcy said he was "homeless" and "living in his car."

When police arrived at approximately 8:00 a.m., Marcy reported that she woke up that morning to find defendant in her apartment. She did not know how he got in. He said she had been "caught slipping" and asked, "[W]here's your fucking phone at." Marcy grabbed the phone and went into a fetal position, clutching the phone to her abdomen to prevent defendant from taking it. Defendant succeeded in taking it from her grasp and left. A police officer observed that Marcy had lacerations on her knuckles.

Later that same day, at approximately 2:34 p.m., police responded to another call at Marcy's apartment. Marcy reported that defendant broke in again while she was eating and asked if she was cheating on him. He chased her into the parking lot and shook her back and forth. Marcy had another phone and she attempted to call 911. Defendant took the phone from her, stating, "Good luck having the cops find me."

At trial, defense counsel asked Marcy to confirm that the phone she had with her the morning of August 16 was one that defendant "had bought and paid for on your behalf." Marcy answered, "Correct."

### 3. *Contraband (count 9)*

Defendant was arrested the evening of August 16, 2019, the day he took the two phones from Marcy. Prior to defendant entering the jail, a police officer informed him that it was a felony to bring illegal contraband into the jail. Defendant said he had nothing on him. Inside the jail, police searched him and discovered a plastic baggie containing .118 grams of cocaine in his shoe.

6

## 4. *Criminal threats (counts 10–11)*

Jailer Anthony I. testified that when defendant was brought to jail and fingerprinted, he was very agitated. He refused to obey commands or comply with a strip search. Eventually he was placed in waist chains because of his high level of agitation.

After defendant was fingerprinted, Anthony I. escorted defendant to his cell. Defendant looked at Anthony I.'s nametag, read it aloud, then said, "If I ever see you on the street, I'm going to smoke you." Anthony I. interpreted "smoke" to mean harm or kill.

Anthony I. had worked as a jailer since 2011. He estimated he had been threatened by inmates 10 to 15 times. He ranked defendant's threat as the most serious he had received. Asked by the prosecutor whether he had any concerns for his safety, he stated that after he went home for the day and had time to reflect on it, "I think that I became a little bit more worried about it; but at the time, I was just trying to do my job." Anthony I. worked his next shift and took no time off as a result of the incident. He did not think he had to worry about his safety while defendant was in custody, but acknowledged he did not know at the time whether defendant would remain in custody or would be released within a few days.

Another jailer, Jacob A., participated in fingerprinting defendant. He testified that defendant was yelling, screaming, agitated, and argumentative, pulling away and resisting. Jacob A. ranked defendant's lack of cooperation "towards the higher end" of how Jacob A. had seen inmates behave.

Later, Jacob A. looked in on defendant during a routine cell check. Defendant told Jacob A. that if he ever saw him on the

7

street, he would "smoke [him] or come find [him]." Jacob A. interpreted "smoke" as shoot or kill. Jacob A. was wearing a uniform with his name on it.

Jacob A. informed other jail staff in the control room what defendant had said so they would know where defendant's "head is at" and that he might become violent as he had during booking.

Jacob A. had been a jailer for five and a half years. He had received around 20 threats from inmates. He ranked defendant's threat "a little bit higher just because the way he was acting towards us when he came in, the way he was resisting with us, and just in general his demeanor . . . ."

Asked if defendant's behavior put him in fear or affected his own behavior, Jacob A. said he was not in fear within the jail because he knew defendant had been searched and any weapons had been taken from him. Outside of custody, however, Jacob A. would not know if defendant had any weapons, "and I do believe that he would probably try to inflict physical pain upon me." Jacob A. completed his shift following the threat and came to work for his next shift as well.

### 5.    *Dissuading a witness (counts 12–13)*

The jury heard recordings of two calls between defendant and Marcy while defendant was in jail, before his preliminary hearing, one on November 22, 2019, and one on November 23, 2019. During the calls, defendant appeared to discourage Marcy from speaking with the district attorney or attending the preliminary hearing. For example, in the first call defendant told Marcy that if she appeared for his preliminary hearing, "they could get me," and without Marcy they would have to drop the case against him. He told her, "You don't call no fucking DA, you

8

don't go to no fucking court." Defendant made similar comments during the second call.

### 6. *Dissuading a witness by force or threat (count 14)*

Marcy appeared at defendant's preliminary hearing. When she was called to the witness stand, defendant exclaimed that the court could not force his wife[5] to testify against him, and told Marcy not to take the stand. The magistrate ordered Marcy to the stand, and defendant continued to instruct Marcy not to do so. At one point, defendant stated, "So don't get on the stand. You better not get on the stand. [¶] Fuck you, mother fucker, dude. They can't do shit to you." Shortly thereafter, defendant said to Marcy, "Walk out of the fuckin' courtroom. They can't arrest you. Leave, shit. Why don't you fuckin' listen? Why aren't you fuckin' listening?" Defendant was removed from the preliminary hearing.

A police detective who attended the preliminary hearing testified at trial that Marcy appeared to be in fear, cowering and looking down.

### DISCUSSION

## A.    Mental Competence

Defendant argues that his behavior throughout the instant proceedings should have raised a doubt as to his mental competence, and the trial court should have ordered a competency examination. Alternatively, defendant argues his

---

[5] The record does not indicate when Marcy and defendant married. During trial they referred to each other as husband and wife.

9

trial counsel was ineffective for failing to ask for a competency examination.  We reject both arguments.

### 1.   Governing law

"The constitutional guarantee of due process forbids a court from trying or convicting a criminal defendant who is mentally incompetent to stand trial." (*People v. Rodas* (2018) 6 Cal.5th 219, 230 (*Rodas*).)  Under the Penal Code, a defendant is mentally incompetent "if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)  Our Supreme Court, quoting *Dusky v. U.S.* (1960) 362 U.S. 402, put it thusly:  "[C]ompetence requires ' "sufficient present ability to consult with [the defendant's] lawyer with a reasonable degree of rational understanding" ' and ' "a rational as well as factual understanding of the proceedings against [the defendant][.]" ' " (*Rodas*, at pp. 230–231.)

The Penal Code "requires that criminal proceedings be suspended and competency proceedings be commenced if 'a doubt arises in the mind of the judge' regarding the defendant's competence [citation] and defense counsel concurs [citation]." (*Rodas, supra*, 6 Cal.5th at p. 231, citing § 1368, subds. (a)–(b).)  This means "that an accused has the right 'to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense.' [Citation.]" (*Rodas*, at p. 231.)  "A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence by the party contending he or she is incompetent." (*People v. Blacksher* (2011) 52 Cal.4th 769, 797.)

"[A]bsent a showing of 'incompetence' that is 'substantial' as a matter of law, the trial judge's decision not to order a competency hearing is entitled to great deference, because the trial court is in the best position to observe the defendant during trial." (*People v. Mai* (2013) 57 Cal.4th 986, 1033 (*Mai*).)

## 2. Relevant proceedings below

On appeal, defendant identifies the following portions of the record as instances that should have raised a doubt in the mind of the trial court and defense counsel as to defendant's mental competence.

During a *Marsden*[6] hearing, when the court asked if defendant had anything else to say, he responded, "Fuck all you all."

During Anthony I.'s testimony in the preliminary hearing, defendant spontaneously directed Anthony I. to "[t]ell the court you all whooped my ass." When the court ordered defendant to be quiet, defendant responded, "Shit. I don't give a fuck. Send me out of the courtroom. Tell the fucking truth."

Defendant also points to his conduct when Marcy appeared at the preliminary hearing, discussed above, in which he vigorously and repeatedly instructed her not to take the stand and to leave the courtroom, and argued with the magistrate about the magistrate's ruling that Marcy must testify despite the spousal privilege. At times, defendant would apologize to the court for interrupting, but would then continue to argue that Marcy could not testify against him, and would continue telling Marcy not to take the stand.

---

[6] *People v. Marsden* (1970) 2 Cal.3d 118.

11

During a hearing regarding the admission of certain evidence, defendant stated, "Man, what the hell this got to do with the fuckin' charges now, man? Can I get up out of this courtroom? I don't want to hear this stupid shit, man." The court asked defendant to sit down, and defendant asked if he could go, stating, "I'm tired of this stupid shit." He was removed from the courtroom.

During trial, outside the presence of the jury, defendant stated that he was being "railroad[ed]" and "they are fucking me over with no evidence." The court warned him that "your demeanor is a factor that this jury must consider for purposes of many of these violations," and "[i]f you [act out] in front of them, they're going to look at you in a negative light, which I'm trying to prevent." Defendant said, "This courtroom is bullshit."

Before the reading of the verdicts, a deputy sheriff reported to the court that defendant, while entering the custody elevators, had stated he would " 'fuck up' this courthouse." The court ordered defendant shackled.

### 3.    Analysis

Defendant argues "there was ample evidence before the court that [defendant's] medical condition rendered him mentally incapacitated to assist counsel in his defense. First, [defendant] continued to be profane during most of the court proceedings, even when admonished not to be disruptive by the trial judge. He showed a distrust and inability to work with his trial counsel during the *Marsden* hearing. He persisted in attempting to keep Marcy D. from testifying during the preliminary hearing and the trial when it would be clear to almost anyone in their right mind that there were would be criminal consequences for his behavior. He at times was apologetic with the trial court for his 'anger' only

12

to become angry and profane again. [Defendant] clearly did not act in his self interest by continuing to disregard orders of the court and engage in behavior that any rational and sane person would believe would have criminal consequences." Defendant cites an academic paper as evidence that "anger may come from a neurological disease or impairment."

On this record, we see insufficient evidence of incompetence such that the trial court or defense counsel had a duty to investigate further. We do not disagree that defendant's disruptive conduct was not in his best interest, and that he may have been a difficult client. The test for competence focuses less on behavior than on comprehension, however, that is, whether the defendant is capable of consulting with his lawyer " ' "with a reasonable degree of rational understanding" ' " and whether the defendant has " ' "a rational as well as factual understanding of the proceedings . . . ." ' " (*Rodas*, *supra*, 6 Cal.5th at pp. 230–231.)

Here, the record indicates defendant certainly understood he was in a criminal judicial proceeding, given that in his outbursts he referred to evidence, privileges, and at one point, hearsay and the best evidence rule. Although his behavior likely did not aid his defense, it did not indicate that he was incapable of rationally consulting with his attorney if he so chose.

It is true that a "defendant's demeanor and irrational behavior may . . . , in proper circumstances, constitute substantial evidence of incompetence," but "disruptive conduct and courtroom outbursts by the defendant do not necessarily demonstrate a present inability to understand the proceedings or assist in the defense." (*Mai*, *supra*, 57 Cal.4th at p. 1033.) Our Supreme Court has also "frequently recognized the distinction"

13

between a defendant who is "emotionally *unwilling*[ ] to help with his defense" as opposed to "mentally *unable*" to do so, and has "made clear that an uncooperative attitude is not, in and of itself, substantial evidence of incompetence." (*Id.* at p. 1034.) Under these principles, and on this record, defendant's outbursts and uncooperative attitude were insufficient to give rise to a duty by the trial court to order a competency investigation. For the same reason, we cannot conclude on this record that defense counsel was ineffective for failing to request a competency investigation.

## B. There Was Insufficient Evidence of Child Abuse (Counts 3–5), But Substantial Evidence of Robbery (Count 6) and Criminal Threats (Counts 10–11)

Defendant contends there was insufficient evidence to support the three counts of child abuse, the first robbery count, and the two counts of criminal threats.

" 'When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [ Citation.] Our review must ' "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." ' [Citation.] Even where . . . the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ' " 'be reasonably reconciled with the defendant's innocence.' " ' [Citations.] The relevant inquiry is whether, in light of all the evidence, a reasonable trier of fact

14

could have found the defendant guilty beyond a reasonable doubt." (*People v. Gomez* (2018) 6 Cal.5th 243, 278.)

**1.    The evidence was insufficient to establish defendant had care and custody of the children as required under section 273a, subdivision (b)**

Section 273a, subdivision (b), provides, in relevant part, that if a person, "ha[s] the care or custody of any child" and "willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered," that person "is guilty of a misdemeanor."[7]  Defendant contends there was insufficient evidence that he had the care or custody of the children, and thus he could not be convicted of counts 3 through 5.  We agree.[8]

"Courts of Appeal . . . have stated that having ' "care or custody" [of a child does] not imply a familial relationship but

---

[7]  The quoted language is the portion of the statute on which the trial court instructed the jury.  The full subdivision reads, "Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor."  (§ 273a, subd. (b).)

[8]  Given our conclusion, we do not address defendant's argument that there was insufficient evidence of criminal negligence, one of the elements of section 273a, subdivision (b), listed in CALCRIM No. 823.

15

only a willingness to assume duties correspondent to the role of a caregiver.' [Citations.]" (*Bom v. Superior Court* (2020) 44 Cal.App.5th 1, 18 (*Bom*).) "That a person did undertake caregiving responsibilities may be shown by evidence of that person's conduct and the circumstances of the interaction between the defendant and the child; it need not be established by an affirmative expression of a willingness to do so." (*People v. Perez* (2008) 164 Cal.App.4th 1462, 1476 (*Perez*).)

Courts rejecting challenges to convictions based on the "care or custody" prong point to affirmative evidence that the defendant undertook the care or custody of the child, however briefly. For example, in *Perez* there was evidence the child called the defendant " 'Daddy Joe,' " that they ate meals together, and that defendant had babysat for her one time. (*Perez, supra*, 164 Cal.App.4th at p. 1471.) There was also evidence from which the jury could infer the defendant looked after the child while her mother was at work and her grandmother was asleep. (*Ibid.*) In *People v. Morales* (2008) 168 Cal.App.4th 1075, the court held that the defendant had care and custody of a 16-year-old to whom he gave a ride in his car, because the child could not leave the car while it was moving and had no control over the vehicle: "The jury could reasonably conclude that in taking it upon himself to control [the 16-year-old's] environment and safety, defendant undertook caregiving responsibilities or assumed custody over her while she was in his car." (*Id.* at pp. 1083–1084). Other cases demonstrate similar types of evidence. (See, e.g., *People v. Flores* (2016) 2 Cal.App.5th 855, 882 [children had lived with defendant for many months, they referred to her as their " 'new mom,' " and she was their sole caregiver for part of the week]; *People v. Malfavon* (2002) 102 Cal.App.4th 727, 737 [defendant

16

admitted he was responsible for child when injuries occurred, and mother testified she had left child in defendant's care in the past]; *People v. Culuko* (2000) 78 Cal.App.4th 307, 335 [defendant lived with child, was left alone with child, bathed, changed, and fed child, and stated that he was taking full responsibility for caring for child]; *People v. Toney* (1999) 76 Cal.App.4th 618, 622 [defendant married child's mother, invited child into his home, provided child with his own room, and "allowed [the child] to use an area in the living room where the child's paperwork was found"]; *People v. Cochran* (1998) 62 Cal.App.4th 826, 833 (*Cochran*) [child lived in defendant's home at defendant's invitation, and mother described defendant as "surrogate father"].)

In the instant case, there was no evidence comparable to that in the above cited cases. All the jury heard was that defendant was at Marcy's apartment overnight from July 20 to July 21, 2019, and that he was the father of the youngest of the three children. Missing was any "evidence of [defendant's] conduct and the circumstances of the interaction between the defendant and the child[ren] . . . ." (*Perez, supra,* 164 Cal.App.4th at p. 1476.) Although there was evidence defendant and Marcy had a relationship and a child together, this did not in itself establish defendant "undert[ook] caregiving responsibilities" for the children. (*Ibid.*) There was no evidence as to whether or how long defendant may have lived or stayed over in the apartment with the children before July 20, 2019. There was no evidence that defendant ever looked after the children, provided for them, or spent time alone with them. Thus, the jury had no information from which to conclude defendant at any point had "care and custody" of the children.

17

The Attorney General argues that defendant assumed
" 'care and custody' " of the children when he "forced the
conditions causing Marcy to flee his violent attack, which left him
alone supervising the children."  This suggested interpretation of
the statute stretches the phrase "care or custody" beyond its plain
meaning.  (See *Cochran, supra*, 62 Cal.App.4th at p. 832 [there is
"no special meaning to the terms 'care and custody' beyond the
plain meaning of the terms themselves"].)  As the cases cited
above demonstrate, the phrase "care or custody" applies to those
who have willingly undertaken to care for a child in some fashion.
Defendant assaulting Marcy and causing her to flee cannot by
itself be construed as defendant indicating an intent to care for
Marcy's children.  Whatever moral responsibility defendant may
have had for the children after causing their caretaker to flee
does not equate with "care or custody" under section 273a,
subdivision (b).

The Attorney General further argues that defendant "was
under a common law duty to protect his children."  Assuming
arguendo defendant had such a duty, it would not make him
criminally liable under the "care or custody" prong of
section 273a, subdivision (b).  As this division held in *Bom*, that
prong "explicitly applies to those who, in fact, have the 'care or
custody' of the child," and cannot be extended to those who
merely "have a duty to undertake the care or custody of the
child." (*Bom, supra*, 44 Cal.5th at p. 19, italics omitted.)[9]  Thus,

---

[9]  In *Bom*, the People charged four social workers with the
Los Angeles County Department of Children and Family
Services (DCFS) with felony child abuse under section 273a,
subdivision (a).  (*Bom, supra*, 44 Cal.App.5th at p. 4.)  An issue

to the extent defendant had a duty to provide care as the parent of one or more of the children, this did not absolve the prosecution of its obligation to prove the children actually were in his care and custody. The prosecution did not meet that burden.

We therefore reverse the convictions on counts 3 through 5. Because the sentences on those counts are concurrent with those on other counts, reversing the convictions does not affect defendant's overall sentence. Remand for resentencing is unnecessary.

## 2. There was substantial evidence of robbery

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The trial court instructed the jury that, to commit robbery, the defendant must have "t[aken] property that was not his own." (See CALCRIM No. 1600.)

As discussed, defendant was convicted of robbing Marcy of two phones, one on the morning of August 16, 2019, and one in the afternoon that same day. Defendant challenges his conviction for the first robbery, charged as count 6. Relying on

---

on appeal was whether the social workers had "care or custody" of a seven-year-old boy for whom they provided emergency and family maintenance services, and who died at the hands of his parents six weeks after DCFS closed its case. (*Id.* at pp. 4, 17.) The People argued the social workers were caregivers by virtue of statutes and social services manuals purportedly imposing a duty to care for children in certain circumstances. (*Id.* at p. 19.) We rejected the People's reading of section 273a to impose criminal liability on those who had a duty to undertake the care and custody of a child, but had not actually done so. (*Ibid.*)

19

Marcy's testimony that defendant bought and paid for the phone on her behalf, he contends the phone was his, and therefore by definition he could not steal it.

We disagree. Although Marcy's testimony could support defendant's position, there was evidence from which the jury could conclude the phone belonged to Marcy. Marcy's confirmation at trial that defendant bought the phone "on [her] behalf" implies it was a gift—that is, defendant was not purchasing it for himself. This conclusion is further supported by Marcy's statement on the 911 call that defendant "came in here and took *my* phone," and her statement to police that defendant had broken in and asked her, "Where's *your* fucking phone at." (Italics added.) Marcy also told the 911 dispatcher that defendant was homeless, meaning he no longer was living with her. Therefore, the jury had no reason to conclude Marcy and defendant might share the phone as a household item.[10] The evidence was sufficient to support the robbery count.

### 3. There was substantial evidence of criminal threats

To establish a criminal threat in violation of section 422, the prosecution must show: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made

---

[10] Defendant makes no argument that he was entitled to the phone under principles of community property, and we therefore do not address that possibility.

verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)

The prosecution alleged that defendant committed two violations of section 422 by telling two jailers he would "smoke" them if he saw them on the street. Defendant argues that the prosecution failed to show that his statements caused the two jailers to be in sustained fear, because both testified that they were not concerned as long as defendant was in custody. Defendant further argues that because his remarks were not "accompanied by physical violence or touching," the remarks were "nothing more than testosterone laden posturing," and any fear experienced by the jailers therefore was not reasonable under the circumstances. Finally, citing *In re Ricky T.* (2001) 87 Cal.App.4th 1132 (*Ricky T.*), defendant argues that his remarks "did not carry any reasonable likelihood of execution and were not time specific."

We reject these arguments. As to whether defendant's comments caused the jailers to experience sustained fear, " 'sustained' has been defined to mean 'a period of time that extends beyond what is momentary, fleeting, or transitory. . . . The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear.'

21

[Citation.]' [Citation.]" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 808 (*Wilson*).)

Here, the jailers provided testimony from which the jury could conclude their fear was not momentary, fleeting, or transitory. Anthony I. testified that the threat was the most serious he had received in nearly a decade serving as a jailer, and when he had time to reflect on it later that evening, he became more worried. Jacob A. was sufficiently concerned about the threat that he reported it to staff in the jail control room. The jailers' " 'knowledge of defendant's prior conduct' " (*Wilson*, *supra*, 186 Cal.App.4th at p. 808), namely his anger and resistance during booking, further supported the conclusion that they had sustained, reasonable fear about defendant's capacity for violence against them. Indeed, Jacob A. specifically testified he considered defendant's threat more serious because of defendant's demeanor and conduct when he was first brought in.

The fact that the jailers may not have felt they were in immediate danger, given defendant's incarceration, is not dispositive. "While the third element of section 422 . . . requires the threat to convey ' "a gravity of purpose and an immediate prospect of execution of the threat," ' it 'does not require an immediate ability to carry out the threat. [Citation.]' [Citations.]" (*Wilson*, *supra*, 186 Cal.App.4th at p. 807.) In *Wilson*, for example, the court upheld a criminal threats conviction against an incarcerated defendant who threatened to "find" and "blast" a correctional officer when the defendant was released in 10 months. (*Id.* at p. 814.) The court held that, despite the 10-month delay before the defendant potentially could carry out the threat, the danger nonetheless was "immediate" because the defendant's threats "were extremely specific and

22

based only upon the 'condition' and certainty of his upcoming release." (*Id.* at pp. 816–817.)

Here, similarly, defendant threatened to "smoke" the jailers if he saw them on the street, meaning once he was no longer in custody. It is true that, unlike in *Wilson*, the jailers did not know at the time defendant threatened them when he might be released, and thus defendant's threat lacked the specificity and certainty of the threat in *Wilson*. Given, however, that defendant had just been arrested, and had not yet been arraigned, it was conceivable he might be released shortly for any number of reasons, including by posting bail. Thus, his threat, which potentially he could carry out within days of making it, was even more pressing than the threat in *Wilson*, in which the defendant himself made clear he would not be released for 10 months. In short, because the jailers in the instant case had no reason to know they would be protected for any period of time, defendant's threat "convey[ed] ' "a gravity of purpose and an immediate prospect of execution of the threat[.]" ' " (*Wilson*, *supra*, 186 Cal.App.4th at p. 807.)

We disagree that defendant's statements were, as he puts it, "[un]accompanied by physical violence or touching." Both jailers testified regarding defendant's anger and resistance during fingerprinting. Although defendant may not have touched the jailers at the moment he threatened them, he had shown a willingness to exert force against them or their colleagues. Regardless, physical contact is not a required element under section 422.

*Ricky T.* is distinguishable. In that case, a high school teacher opened a classroom door, inadvertently striking a student standing on the other side. (*Ricky T.*, *supra*, 87 Cal.App.4th at

23

p. 1135.)  The student became angry and told the teacher, according to differing reports, " 'I'm going to get you,' " or, " 'I'm going to kick your ass.' "  (*Id.* at pp. 1135–1136.)  The student was convicted of a misdemeanor under section 422.  (*Ricky T.*, at p. 1135.)  On appeal, the questions were whether there was sufficient evidence that the threat was "unequivocal and immediate" and that it "caused [the teacher] to be in sustained fear for his safety."  (*Id.* at p. 1137.)

The appellate court concluded the threat was neither unequivocal nor immediate.  The court noted the school did not notify the police until the next day, and the police, after first interviewing the student, waited a full week before speaking with him again, suggesting the threat was not immediate.  (*Ricky T.*, *supra*, 87 Cal.App.4th at p. 1138.)  The court concluded the statement " 'I'm going to get you' " was "ambiguous on its face and no more than a vague threat of retaliation without prospect of execution."  (*Ibid.*)  The " 'kick your ass' " statement was "made in response to [the student's] accident with the door."  (*Ibid.*)  Distinguishing other cases, the court noted a lack of prior history of disagreements, quarrels, or exchanges of hostile or offensive words between the teacher and student that might, in context, suggest the threat was more serious than it appeared on its face.  (*Ibid.*)  Nor was there evidence that "a physical confrontation was actually imminent" or that the student's "angry words were accompanied by any show of physical violence."  (*Ibid.*)

The court further held the evidence of sustained fear was insufficient.  The teacher admitted the threat was not specific, and the police were not notified until the following day.  (*Ricky T.*, *supra*, 87 Cal.App.4th at p. 1140.)  The court noted that the student did not "tak[e] advantage" of the teacher's fear, but

24

instead complied with the teacher's directive to go to the school office. (*Ibid.*) The court held that sending the student to the school office did not itself indicate sustained fear, but rather "was an appropriate, necessary response to a disruptive classroom incident." (*Ibid.*) "There is no evidence that [the teacher] felt fear beyond the time of the angry utterances." (*Ibid.*)

In conclusion, the court stated that "section 422 was not enacted to punish an angry adolescent's utterances . . . ." (*Ricky T., supra*, 87 Cal.App.4th at p. 1141.) "[The student's] statement was an emotional response to an accident rather than a death threat that induced sustained fear." (*Ibid.*)

The contrasts between *Ricky T.* and the instant case are myriad. Rather than a high school student threatening to "get" a teacher in the heat of the moment immediately following an accident, here we have an inmate specifically threatening to kill two jailers, not in the heat of the moment, but while being walked to his cell or during a routine cell check. The threats were all the more grave because the jailers knew defendant had physically resisted attempts to fingerprint and search him, and thus the history of confrontation and physical violence absent in *Ricky T.* was present here. The jailers' testimony discussed above established their fear was sustained, with Anthony I. worrying about the threat that evening, and Jacob A. reporting it to the jail control room. For all these reasons, the evidence was sufficient to support the two convictions under section 422.

## C. The Trial Court Did Not Abuse its Discretion By Admitting Evidence of Defendant's Prior Acts of Domestic Abuse

The trial court allowed the prosecution to admit evidence of defendant's uncharged conduct on June 3, 2018, the incident in

25

which defendant allegedly entered Marcy's home, slapped her multiple times, dragged her by her shirt, took her phone, and stated he would return with a gun to kill her. In allowing admission of this evidence, the trial court cited Evidence Code sections 1101, subdivision (b) and 1109. On appeal, defendant contends those Evidence Code sections did not provide a basis to admit the evidence. Alternatively, he argues the evidence should have been excluded under Evidence Code section 352 as unduly prejudicial. We reject these arguments.[11]

### 1. Governing law

"Evidence Code section 1101, subdivision (a), 'prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion.' " (*People v. Washington* (2021) 61 Cal.App.5th 776, 787.)[12] This rule, however, does not "prohibit[ ] the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact . . . other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) In other words, evidence of prior uncharged conduct is admissible for purposes *other* than to prove the defendant has a

---

[11] We assume without deciding that defendant properly preserved these arguments below.

[12] "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).)

disposition to commit similar acts.[13]  (See *People v. Merchant* (2019) 40 Cal.App.5th 1179, 1191 (*Merchant*) ["specific acts of prior misconduct may be offered for a noncharacter purpose . . . ."].)

Additionally, the Legislature has created a statutory exception to the prohibition on propensity evidence for defendants charged with "an offense involving domestic violence." (Evid. Code, § 1109, subd. (a)(1).)  In such cases, the prosecution is permitted to introduce "evidence of the defendant's commission of other domestic violence . . . ."  (*Ibid.*; see *People v. Fruits* (2016) 247 Cal.App.4th 188, 202 ["Evidence Code section 1109 is an express exception to the prohibition against propensity evidence set forth in Evidence Code section 1101, subdivision (a)."].)  The exception "reflects the Legislature's determination that in domestic violence cases, similar prior offenses are uniquely probative of a defendant's guilt on a later occasion."  (*Merchant*, *supra*, 40 Cal.App.5th at p. 1192.)

Admission under Evidence Code sections 1101, subdivision (b) and 1109 is limited by Evidence Code section 352, under which the trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or

---

[13]  Evidence Code section 1101, subdivision (b) lists examples of noncharacter purposes for which prior act evidence may be admitted, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented."

27

(b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"We review the admission of [prior] act evidence for abuse of discretion." (*Merchant, supra*, 40 Cal.App.5th at p. 1192.)

## 2. Analysis

As discussed, prior acts evidence is admissible to prove something other than the defendant's propensity to commit such acts. (Evid. Code, § 1101, subd. (b).) Here, defendant was charged under section 136.1, subdivision (c)(1), based on allegations that he dissuaded Marcy from testifying at his preliminary hearing, and did so "by force or by an express or implied threat of force or violence." Defendant's prior history of violence and threats of violence against Marcy was relevant to establish that when defendant said to Marcy, "You better not get on the stand," or when he told her to leave the courtroom, those statements contained an "implied threat of force or violence." (§ 136.1, subd. (c)(1).) That is, given the violent history between them, both defendant and Marcy would understand his words, which lacked any express threat of force or violence, nonetheless implied that he would harm her if she disobeyed him. This was a permissible, noncharacter basis to introduce the evidence.

Defendant argues that even if the evidence was admissible under Evidence Code section 1101, subdivision (b), the trial court should have excluded it under Evidence Code section 352 as unduly prejudicial. Defendant contends the evidence of the June 2018 incident, in particular the evidence that he threatened to return with a gun to kill Marcy, was "egregious" compared to the "relatively benign" facts of his charged offenses, and would lead the jury to conclude he was "a dangerous individual with a

28

propensity to commit serious acts of domestic violence and someone who in the future might hurt someone with a firearm."

We agree the evidence of the June 2018 incident might lead the jury to conclude defendant was "a dangerous individual" who might commit serious acts of violence against Marcy with a firearm. That possibility did not make the evidence unduly prejudicial, however, but highly probative on the issue of whether defendant, in instructing Marcy not to take the stand at his preliminary hearing, impliedly threatened her with violence. To illustrate for the jury the potential gravity of defendant's implied threat, the prosecution was entitled to show that defendant had made violent threats and acted violently towards Marcy in the past, up to and including threatening to shoot her with a gun.

Defendant's cited authorities are distinguishable. In *People v. Jefferson* (2015) 238 Cal.App.4th 494, a case concerning a defendant charged with offenses related to possession of a stolen firearm, the court held it was unduly prejudicial to introduce evidence that the defendant owned several other registered firearms. (*Id.* at pp. 506–507.) The court concluded the evidence "was not highly probative and it prejudiced [the defendant] primarily by painting him as a dangerous person in a dangerous neighborhood probably engaged in a dangerous profession, drug dealing." (*Id.* at p. 507.)

In *People v. Clark* (2021) 62 Cal.App.5th 939, the court held that evidence of a defendant's previous uncharged conduct of possession a firearm had "insubstantial probative value" on the issues of knowledge and motive in a case involving robbery and illegal possession of a firearm, and was highly prejudicial. (*Id.* at pp. 944, 966–967.)

29

In both *Jefferson* and *Clark*, the courts concluded the prior acts evidence was not highly probative, and thus any minimal benefits to its admission were outweighed by the potential prejudice. In the instant case, in contrast, we have concluded the prior acts evidence was highly probative in regard to the charge under section 136.1, subdivision (c)(1), precisely because the egregiousness of the prior acts evidence made it probative on the issue of whether defendant's statements to Marcy to dissuade her from testifying contained an implied threat of violence.

In his reply brief, defendant argues that he was denied his right to cross-examine Marcy regarding the June 2018 incident. The basis of this argument is unclear; defendant first states, inaccurately, that Marcy did not appear at trial, then states that, because she was not examined regarding the June 2018 incident, she "was not subject to cross-examination." This argument is forfeited for failure to raise it in the opening brief. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.) The argument also fails on the merits. Marcy did appear at trial, and nothing prevented defendant from calling her as a witness if he so chose.[14]

Given our conclusion that the evidence of the June 2018 incident properly was admitted under Evidence Code section 1101, subdivision (b), we need not reach defendant's arguments concerning Evidence Code section 1109.

---

[14] Defense counsel stated on the record that he intended to ask Marcy more questions at trial, but defendant instructed him not to do so.

30

## DISPOSITION

The convictions on counts 3, 4, and 5 are reversed. The trial court shall amend the abstract of judgment accordingly, and forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. The judgment otherwise is affirmed.

NOT TO BE PUBLISHED.


                                        BENDIX, J.


We concur:



ROTHSCHILD, P. J.



CRANDALL, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.