Filed 6/28/24  P. v. Villarreal CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>NORBERTO DANIEL VILLARREAL,<br><br>        Defendant and Appellant. | A166603<br><br>(Alameda County<br> Super. Ct. No. 467975B) |

A jury convicted defendant Norberto Daniel Villarreal of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true gang and firearm-related enhancement allegations (§§ 186.22, subd. (b)(5), 12022.53, subds. (d), (e)(1)). On appeal, Villarreal raises a claim of evidentiary error, arguing the trial court prejudicially erred by admitting evidence of a firearm—not the murder weapon—found in Villarreal's possession when he was arrested.  We reject this claim.  Villarreal's other claims on appeal have been resolved by recent California Supreme Court authority or are conceded by the People.  We

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

reverse the true findings on the gang enhancements and affirm in all other respects.

## I. BACKGROUND

In 2021, by amended information, the People jointly charged Villarreal and Gabriel Joseph Martinez (codefendant) with the May 2016 murder of Dariel Arreola (§ 187, subd. (a); count one), with gang and firearm enhancement allegations (§§ 186.22, subd. (b)(5), 1203.06, subd. (a)(1), 12022.5, subd. (a), 12022.53, subds. (b)–(e), (g)).[2] The People charged Villarreal alone with shooting at an occupied vehicle related to a separate incident (§ 246; count two), which also included gang and firearm enhancement allegations (§§ 186.22, subd. (b)(4), 12022.5, subd. (a), 12022.53, subds. (b), (c), (g)). The codefendant was also charged with other offenses and enhancements (counts three through six). Villarreal and the codefendant were jointly tried.

### A. Prosecution Case

The People's theory at trial was that a violent gang war erupted in 2015 between Decoto XIV (Decoto)—Villarreal's and the codefendant's alleged gang—and the Hayward Original Gripp Getters (Hoggs). The People contended the murder of Hoggs member Arreola was part of this war.

#### 1. Mission Boulevard Shooting—December 30, 2015 (Count Two)[3]

On December 30, 2015, a witness saw a black "Camaro-looking" car stop near a gold/brown car—later identified as a silver or cashmere colored

---

[2] The prosecution's theory was that the codefendant was the shooter and Villarreal aided and abetted him by driving the van. (See CALCRIM No. 400 [a person may be guilty of a crime by either directly committing the crime (the perpetrator) or by aiding and abetting the perpetrator].)

[3] A jury acquitted Villarreal of this charge.

2

Lexus—on the frontage road adjacent to Mission Boulevard in Hayward. The driver of the black Camaro got out of the car and shot a gun into the Lexus, then he got back in the car and drove off. After being shot at, the Lexus driver got out of his car and shot at the black car as it drove away. The Lexus driver was later identified as Edward Murguia, a Hoggs member.[4]

Within 30 minutes of the Mission Boulevard shooting, there was another shooting nearby on Teddy Drive in Union City which involved a black Camaro. A resident saw a black sports car driving down the street, when a man in a parked car started shooting at the black sports car. The black car then reversed, turned around, and drove away in the direction from which it had come. The witness saw a bullet hole in the passenger side of the black car.

Records showed a 2015 Chevrolet Camaro registered to a woman at a Teddy Drive address with which Villarreal was associated. Villarreal had received a speeding ticket while driving the Camaro in July 2015.

2. *Residential Shooting—April 28, 2016 (Counts Three and Four)*[5]

On April 28, 2016, a car pulled up in front of the house of Yovani Torres, a Hoggs member, and the driver started shooting at Torres, who was in the driveway. Police identified the codefendant as the shooter.

3. *Dariel Arreola Murder—May 15, 2016 (Count One)*

On May 15, 2016, around 7:30 p.m., Arreola, a high-ranking Hoggs member, was shot eight times and killed outside the San Leandro Senior Center (senior center). A security guard heard gunshots and saw Arreola fall to the ground. He saw a person possibly with a face covering run towards a

---

[4] Murguia was charged with, and pled guilty to, the shooting.

[5] Counts three and four were alleged only against the codefendant.

vehicle, which he believed was a van, and then he saw the van drive down 138th Avenue towards East 14th Street.

Around 7:35 p.m., a witness was driving on East 14th Street near the intersection of 138th Avenue. As he drove through the intersection, a van crashed into him, then he saw two people running away. They were perhaps Latino and wore dark clothing. Another witness saw two men running on 138th Avenue away from the crash. One of the men had a gun in his hand and put it in his pocket. The witness described them as 20 to 25 years old wearing all black clothing.

A woman who lived nearby heard a car crash and went outside. She saw two men running on 138th Avenue away from the crash scene in her direction. They turned left onto Bancroft Avenue then turned left into an alley behind the Walgreens in Palma Plaza shopping center. The witness only saw one of the suspect's faces. He was a young man with medium skin tone and long, black, bushy hair. The man was about six feet tall and was not heavyset; he was "medium build." He wore black pants, black shoes, and a black long sleeve hoody. The witness identified Villarreal as this man at trial, as she had done during the preliminary hearing. 10 days after the murder, she participated in a photo lineup at the police station. She looked at several photos and identified Villarreal as the man she had described running from the crash scene.

The witness could not see the other man's face because he was running behind the taller man, but the other man wore all black and tried to cover his face by pulling his sweatshirt up over his face. The second man was thin and two or three inches shorter than the first man. Both men wore gloves.

Police lifted fingerprints from the van used in the murder. The fingerprints matched three people, including Jose Madrigal and Alonzo Hernandez, who were not the owners of the van.

Police found a loaded Glock-22, .40-caliber S&W firearm in the center console area of the van's floorboard. It matched the firearm that had fired a .40-caliber cartridge case which had been found at the scene of the December 2015 Mission Boulevard shooting. Police were unable to lift any fingerprints from the firearm, but they did collect DNA swabs. There was DNA on the firearm from at least three people, one of whom was the major profile, which is the person who donated the most DNA. The major profile matched Villarreal.

Police recovered seven .40-caliber S&W cartridge cases from the scene of Arreola's murder. All seven cartridge cases had been fired from the same Glock-type gun used in the residential shooting at Torres's house. The gun that had been found in the van was not the murder weapon.

Police obtained surveillance videos from the senior center and several buildings in the area, which the district attorney's office compiled into a chronological sequence showing the events that happened before, during, and after Arreola's murder. The videos were played for the jury.[6] At 6:06 p.m., a black Camaro drove in front of the senior center, around the front courtyard and parking lot area, then drove away back down 138th Avenue. At 7:08 p.m., the van that was later involved in the murder drove into the Palma Plaza shopping center and parked in the parking lot. At 7:10 p.m., the black Camaro entered Palma Plaza and parked on the other side of the parking lot. After the van had parked, two males—identified as Jose Madrigal and Alonzo

_____

[6] The People concede that the surveillance video is not "of sufficient quality to identify the shooter or driver of the van during the murder."

Hernandez—walked away from the location of the van.[7] They then returned to the van, moved it to a different parking spot, exited the van, and walked away. As they walked away from the van, another male walked towards Madrigal and Hernandez and stopped briefly to talk with them. A fourth male then appeared in the video. Those two suspects got into the van.

The van then drove out of the shopping center parking lot and drove to the senior center, circled the parking lot, and exited onto East 14th Street. Seconds later, it returned down 138th Avenue past the senior center and drove to the next intersection, made a U-turn, and drove back down 138th Avenue towards the senior center where it parked just past the senior center's front courtyard. There was choppy footage of the shooting taking place.

After the van collision, two subjects ran down 138th Avenue, turned onto Bancroft Avenue, went through the alleyway near the Walgreens parking lot, and got into the black Camaro that was parked at the shopping center. The Camaro had a white sticker on the passenger-side rear quarter panel.

On May 17, 2016—two days after the murder—the codefendant was arrested. He was in a vehicle with two Decoto members, including Alonzo Hernandez, and was wearing a bulletproof vest. A loaded .38-caliber gun and a loaded Glock .40-caliber gun were in the vehicle. Hernandez's cell phone contained a screen shot with a picture of the murder victim.

The black Camaro was registered to Villarreal's mother at an address on Teddy Drive. On June 14 and 15, 2016, police conducting surveillance on Villarreal saw him drive the black Camaro to an address on South Willard

---

[7] Police interviewed Madrigal and Hernandez. They were not considered as suspects in the murder.

6

Avenue in San Jose where he was residing. On June 27, 2016, after learning of the DNA match with the van firearm, police arrested Villarreal. He had long hair. When Villarreal was arrested, the Camaro was parked in front of the South Willard Avenue residence. There was a sticker on the Camaro's rear passenger side quarter panel covering a bullet hole. Inside the Camaro, police found a loaded subcompact Springfield .40-caliber firearm under the driver's seat. They also recovered a black and white bandana, a pamphlet in the name of Luis Miranda, a shirt that said, "in loving memory of Luis Miranda," a medical marijuana card, and a letter sent to Villarreal from a Decoto member who was in prison. In the trunk, they found a backpack with a cell phone inside.

The cell phone found inside the backpack contained several selfies of Villarreal, including intimate selfies. Villarreal's email address was associated with the phone. The phone contained numerous text messages addressed to both Norberto and Daniel, and it had Villarreal's resume listing that phone's number. At 5:10 p.m. on the day of the murder, a contact identified in the phone as "Tnto" texted the address of the senior center to the phone. The text was read and then deleted. Tonto was the moniker for Decoto member Ramon Morales.

On the day of Villareal's arrest, during a search of the South Willard Avenue residence, police found two gang-related DVDs and a black, hooded zip-up jacket. Police also searched the Teddy Drive residence, where they found Villarreal's gang registration card, mail addressed to him, a college ID card, and photos of him with known gang members. The Camaro was sold on July 4, 2016.

*4. Gang Evidence*

Sergeant Sergio Quintero of the Union City Police Department testified as a gang expert. He testified about Decoto, including its turf, structure and symbols. Its primary activities include murder, shooting at homes or occupied vehicles, robbery, and possession of firearms. He testified about predicate acts committed by Decoto members. In 2015 and 2016, there was a rivalry between Decoto and the Hoggs. It began in April 2015 when a Hoggs member was killed, then in August 2015, Decoto member Luis Miranda was shot and killed in retaliation. He testified about other shooting incidents between the two gangs between 2015 and 2016, culminating in Arreola's murder. Sergeant Quintero opined that both Villarreal and the codefendant were Decoto members. He opined that a hypothetical murder like that in the present case would be committed for the benefit of the gang. [8]

## B. Defense Case

A psychology professor testified as an eyewitness memory and identification expert. For eyewitness identification, identifications made within five to ten seconds tend to be highly reliable while identifications with longer latency, like within minutes, are unreliable and highly error prone. He reviewed the video of the witness's photo lineup process and opined that identification which took that long—an estimated five minutes—is unreliable.

Villarreal testified in his defense. He grew up in the Decoto district of Union City in a house with many extended family members, including his

---

[8] Sergeant Andrew Valderrama of the Hayward Police Department testified as a gang expert, providing testimony about the Hoggs. He also testified about the violent rivalry between the Hoggs and Decoto starting in 2015.

cousin Luis Miranda, who was killed in August 2015. He eventually moved to Teddy Drive with his mother and siblings. A juvenile adjudication required him to register as a gang member.

In 2015, he lived at the Teddy Drive house. During this time, his mother bought a black Camaro, which he had access to, as did his other family members. In 2015, he drove the Camaro frequently to and from Teddy Drive. In early 2016, when he moved to his father's residence on South Willard Avenue in San Jose, he continued to drive the Camaro between his father's, mother's, and girlfriend's residences. The Camaro was parked at the South Willard Avenue address when he was arrested.

Villarreal denied being in the Camaro and denied shooting at a vehicle on Mission Boulevard on December 30, 2015. His brother, Kevin, had driven the Camaro to their grandmother's house that day. The sticker on the Camaro was covering a bullet hole that occurred during the December 30 shooting. He became aware of the bullet hole when Kevin told him about it.

In the afternoon of May 15, 2016, he drove the Camaro with Kevin and his cousin, Douglas, to their grandmother's house down the street. He left the Camaro keys at her house. While hanging out outside, his female friend drove up and he left with her in her car, and he spent the night with her. He had left the Camaro parked at his grandmother's house. When he returned to Teddy Drive, the Camaro was parked back at his mother's house. He denied going to San Leandro and denied going to the senior center. He did not really know the codefendant; he had seen him before with his brother.

Villarreal testified that the gun found in the Camaro when he was arrested was in his possession. The mail from the inmate, the medical marijuana card, and the bandana found in the Camaro were also his. The backpack found in the trunk and the cell phone found in the backpack were

9

not his; they were his cousin Douglas's items.  Villarreal and Douglas shared the phone, and both of them used it.  The phone's contacts listed as "Dad" and "Mom" were Villarreal's parents, but Douglas also called Villarreal's parents dad and mom.  There were multiple text messages on the phone to and from Villarreal's mother.  The phone had a contact for "Tia Evelyn," Villarreal's aunt and Douglas's mother.  The phone had texts with "Kev Bro," Villarreal's brother.  The phone received happy birthday messages on Villarreal's birthday, including a message from "Doug."

In early 2016, Villarreal made plans to go to Nicaragua for a family trip in May, and he got a passport for the trip.  Describing a photo taken in Nicaragua, he described himself as "fat," weighing 230 pounds.  A driver's license application from March 2015 reflected his weight as 230 pounds.

## C. Camaro Firearm Evidence

Before trial, Villarreal filed a motion in limine to exclude from evidence the .40 caliber Springfield Armory pistol, magazine, and ammunition found in the Camaro when Villarreal was arrested on the grounds that the evidence was not relevant and any probative value was substantially outweighed by the danger of undue prejudice, pursuant to Evidence Code sections 210 and 352.  At the hearing, the People opposed the motion, arguing the evidence was relevant because the People contended that Villarreal was armed with a firearm in the incident on December 30, 2015 and that a firearm with Villarreal's DNA was found in the van used in the murder.  The People also argued the evidence was relevant to the gang enhancements, which required them to prove that Decoto was engaged in a pattern of criminal activity, including carrying firearms, shootings, and murders.  Therefore, the People argued, that Villarreal possessed another .40-caliber firearm when he was arrested was "highly relevant to this case as a whole."  Villarreal contended

10

the evidence was unrelated to any of the charged conduct and was only being used to "prove up a propensity to be in possession of a firearm." Villarreal also made a passing contention that the firearm was inadmissible character evidence pursuant to Evidence Code section 1101. The trial court denied the motion. During trial, the court overruled Villarreal's renewed objection to the evidence.

During questioning of gang expert Sergeant Quintero, the prosecutor asked whether the fact that there was a loaded firearm under the driver's seat of the vehicle associated with Villareal affected the witness's opinion. Sergeant Quintero responded it did. He testified it was not uncommon for Decoto members to possess firearms, but given the timeframe of how the war was playing out with the Hoggs, it made sense for Villarreal to possess a firearm.

During closing argument, the prosecutor discussed the Camaro and, despite Villarreal's claim that he was not in it, the prosecutor argued that several events demonstrated the Camaro was always with him and he had control and possession of it. This included a statement that in June 2016, leading up to Villarreal's arrest, officers conducting surveillance observed him several times in the Camaro and, at the time of his arrest, "he's in possession and control of that Camaro. His firearm is loaded and located there."

### D. Verdict and Sentencing

In August 2021, a jury convicted Villarreal of first degree murder and found true the gang allegation (§ 186.22, subd. (b)(5)) and two firearm allegations (§ 12022.53, subds. (d), (e)(1)).[9] The jury acquitted Villarreal of

---

[9] After the jury was unable to reach unanimous verdicts as to the codefendant on the murder charge and one other charge, the trial court

11

shooting at an occupied vehicle and found not true the allegations that Villarreal personally discharged and used a firearm (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a), 12022.53, subds. (b), (c), (g)).  In October 2022, the trial court sentenced Villarreal to 25 years to life in prison for the murder conviction and the gang enhancement (§ 186.22, subd. (b)(5)).[10]

## II. DISCUSSION

The main issue on appeal is whether the trial court prejudicially erred by admitting evidence of the firearm found in the Camaro at the time of Villarreal's arrest.  We briefly address Villarreal's additional arguments on appeal following our discussion of the evidentiary issue.

### A. *Evidence of the Firearm in the Camaro*

The trial court allowed the prosecution to admit evidence that a firearm—which was unconnected to any of the charged crimes—was found in the Camaro when Villarreal was arrested.  Villarreal argues the court committed prejudicial error because this evidence was irrelevant, more prejudicial than probative, inadmissible bad character or propensity evidence, and violated his due process right to a fair trial.  We disagree.

### 1. *Legal Principles and Standard of Review*

"No evidence is admissible except relevant evidence."  (Evid. Code, § 350.) " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (*Id*., § 210.)  Even evidence that is relevant may

---

declared a mistrial as to those two counts.  The jury convicted the codefendant of three other charges.

[10] The trial court did not impose a sentence for the section 12022.53, subdivision (d) enhancement and it struck the section 12022.53, subdivision (e)(1) enhancement for purposes of sentencing.

be excluded if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice. (*Id.*, § 352.) The "test for prejudice under Evidence Code section 352 is not whether the evidence in question undermines the defense or helps demonstrate guilt, but is whether the evidence inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction." (*People v. Valdez* (2012) 55 Cal.4th 82, 145.)

Generally, "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056; see *People v. Riser* (1956) 47 Cal.2d 566, 577 [same]; *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392–1393 [evidence of possession of a weapon not used in the charged crime " 'leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons,' " which is irrelevant to determining guilt].) Such evidence is admissible, though, if relevant to an issue other than propensity. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1072, 1073 (*Nguyen*) [evidence of firearms connected to the defendant but not to the charged shootings was relevant and admissible to show the defendant "was a gang member at war with a rival gang"]; *People v. Cox* (2003) 30 Cal.4th 916, 957 [guns found in the defendant's car were relevant "as weapons that could have been used to coerce the victims into

13

defendant's car or otherwise subdue them, 'in furtherance of the criminal plan' to kill them"].)

We review the trial court's ruling on the admissibility of evidence for abuse of discretion. (*People v. Mataele* (2022) 13 Cal.5th 372, 413.) A decision to admit evidence " ' " 'will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice.' " ' [Citations.] 'This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law. We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise.' " (*Id*. at p. 414.)

### 2. *Abuse of Discretion*

Villarreal argues the Camaro firearm was not relevant "because it was not the firearm used in any of the crimes charged in this case." That the Camaro firearm was not the firearm used to kill Arreola and was not the firearm used in any of the other charged crimes does not automatically render the evidence irrelevant. (See, e.g., *Nguyen, supra*, 61 Cal.4th at p. 1073.) The evidence was not admitted merely to show Villarreal "is the sort of person who carries deadly weapons." (*People v. Barnwell, supra*, 41 Cal.4th at p. 1056.) We reject Villarreal's claim that it was irrelevant for the following reasons.

The Camaro firearm was relevant to whether the Camaro was under Villarreal's possession and control, an issue he disputed. The Camaro itself was important to the murder, which Villarreal concedes, stating the driver of the Camaro in the evening of the murder "appears to be involved in the homicide." One and a half hours before the murder, the Camaro drove through the senior center in what could be construed as conducting

14

surveillance. After the murder, the suspects fled the scene of the van crash, returned to the Palma Plaza shopping center parking lot, got in the Camaro, and drove away.

We agree with the People when they reason that the position of the gun under the driver's seat, "where it could be readily accessed by the driver of the vehicle, and the fact that a gun is not the type of object that a person would leave in someone else's vehicle, have a strong tendency in reason to prove that the possessor of the gun had control over the vehicle." The prosecutor argued as much to the jury. During closing argument, the prosecutor made several arguments to contend Villarreal had control and possession of the Camaro. This included a statement that in June 2016, leading up to his arrest, officers conducting surveillance observed Villarreal several times in the Camaro. And when he was arrested, "he's in possession and control of that Camaro. His firearm is loaded and located there."

Villarreal relies on *People v. Jefferson* (2015) 238 Cal.App.4th 494 (*Jefferson*). There, the defendant was charged with firearms offenses in regard to a stolen gun. (*Id*. at pp. 497–498.) The trial court admitted evidence that he legally possessed two additional guns, which the prosecution argued proved that he knew the charged gun was stolen and that he had control over the car in which it was found. (*Id*. at pp. 498–500, 502.) A divided appellate court concluded the trial court erred by not excluding evidence of the two legal guns. (*Id*. at p. 498.) The appellate court explained that the evidence of the additional guns had no tendency to prove the knowledge element or the defendant's control of the car. (*Id*. at p. 506.) A year after the charged stolen gun was found in the car, police observed the defendant place a bag in the trunk of the same car, which a later search demonstrated contained one of the defendant's legal guns. (*Id*. at pp. 499–

15

500.) The court stated, the "precise nature of any object found in the bag, whether a football or a firearm, adds nothing. Driving a car and accessing the car's trunk to store a bag, even if the bag is empty, demonstrates control. The contents of the bag, if any, have no tendency in reason to prove or disprove control over the vehicle." (*Id.* at p. 506.)

*Jefferson* is distinguishable. Villarreal disputes his control of the Camaro. Unlike in *Jefferson*, no one observed Villarreal place any object, let alone a firearm, in the Camaro. Nor was the firearm found in the trunk or in a bag. It was found under the driver's seat. While the contents of the bag in *Jefferson* had no tendency in reason to prove control over the vehicle, here the firearm has such relevance.

The Camaro firearm also had some tendency in reason to prove Villareal's gang affiliation. The prosecution's gang expert testified Decoto's primary activities included carrying loaded firearms and concealed possession of firearms. He also testified that when the firearm was located in the Camaro at the time of Villarreal's arrest, given the time frame of the war between Decoto and the Hoggs, it made sense for Villarreal to possess a firearm.[11] It is reasonable to infer that Villarreal believed he needed to be armed due to the ongoing gang war. (See *Nguyen, supra*, 61 Cal.4th at

---

[11] Following his statement that it made sense for Villarreal to possess a firearm, the gang expert went on to state that committing the murder of Arreola put a target from the Hoggs. Pursuant to Villarreal's objections, the trial court struck this portion of the testimony. Villarreal contends "the jury nevertheless heard this evidence and all it implied—that appellant was armed with a gun for protection because he participated in the murder of Arreola," arguing you " 'can't unring a bell' heard earlier." Not so. The jury had been instructed that if the court sustained an objection and struck testimony, the jury must disregard it. (See *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 648 ["we presume jurors can 'unring the bell' and follow admonishments and instructions designed to cure" an error].)

16

p. 1073 [evidence of firearms unconnected to the charged shootings showed the defendant "was a gang member at war with a rival gang"].)

Nor was the Camaro firearm evidence inadmissible character evidence under Evidence Code section 1101, a contention Villarreal briefly makes but does not fully develop. "Character evidence is generally inadmissible to prove a defendant's conduct on a specific occasion. ([Evid. Code.,] § 1101, subd. (a).) But specific acts of prior misconduct may be offered for a noncharacter purpose, such as to show intent, common plan, or identity. ([*Id*.,] § 1101, subd. (b).)" (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1191.) Villarreal contends the evidence is inadmissible because it suggested he was "the driver of the van used in the homicide, inasmuch as .40 caliber semiautomatic handguns were found in the van and the Camaro driven by" him. We are not persuaded. Evidence of the firearm found in the Camaro was offered for the noncharacter purpose to show his gang affiliation and his control over the Camaro.

This evidence also did not constitute inadmissible evidence of an uncharged crime. (Evid. Code, § 1101, subd. (b).) There was no argument made that Villarreal's possession of the firearm found in the Camaro was a crime. Villarreal points to the gang enhancement jury instructions identifying criminal firearms offenses, but it does not follow that the jury inferred that the Camaro firearm possession was a crime nor used that crime to infer propensity on Villarreal's part. In sum, the Camaro firearm evidence was not used to prove Villarreal's bad character or criminal disposition. (See *Jefferson, supra*, 238 Cal.App.4th at p. 505.)

To the extent it had probative value, Villarreal contends the Camaro firearm evidence was inadmissible pursuant to Evidence Code section 352 because its probative value was substantially outweighed by its prejudicial

17

effect. He argues the evidence "undoubtedly created an impression for the jury that [he] was a dangerous gang member who surrounded himself with guns." We disagree. There is no likelihood the Camaro firearm evidence "inflame[d] the jurors' emotions" and motivated them to use the evidence to "punish [Villarreal] because of the jurors' emotional reaction." (*People v. Valdez, supra*, 55 Cal.4th at p. 145.) The evidence had probative value while the danger of undue prejudice was low. The jury knew the Camaro firearm was not the murder weapon and was not used in the Mission Boulevard shooting. It also knew Villarreal used or possessed firearms, as his DNA was the major profile found on the firearm recovered from the van used in the murder.

For these same reasons, we conclude Villarreal's due process rights were not violated. (See *People v. Phillips* (2022) 75 Cal.App.5th 643, 686 [concluding "[f]or the same reasons we find no state law error" that the admission of challenged testimony did not deprive the defendant of a fair trial]; *People v. Jones* (2013) 57 Cal.4th 899, 949 [" 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair' "]; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 174 ["Generally, a court's compliance with the rules of evidence does not violate a defendant's right to due process"].)

Because the trial court did not act in an arbitrary, capricious, or absurd manner, we conclude it did not abuse its discretion in admitting evidence of the firearm found in the Camaro. (See *People v. Mataele, supra*, 13 Cal.5th at p. 414.)

### 3. *Harmlessness*

Even assuming the trial court abused its discretion in admitting the Camaro firearm evidence, such error was harmless under *People v. Watson*

(1956) 46 Cal.2d 818, 836, because it is not reasonably probable Villarreal would have obtained a more favorable result had the court excluded the evidence. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test"].)

The jury received the following evidence: Surveillance video showed the black Camaro driving around the senior center one and a half hours before the murder, and the Camaro later parked in a nearby shopping center parking lot. In the same parking lot, two men got into the van used to drive the shooter to the senior center. The van drove to the senior center, the shooter killed Arreola then got back into the van, and the van fled. After the van crashed in a nearby intersection, a witness identified Villarreal as one of the two men running away from the scene. The men returned to the shopping center parking lot on foot, got in the Camaro, and drove away. The Camaro had a sticker on the rear passenger panel, and when Villarreal was arrested, the Camaro had a white sticker on the rear passenger panel covering a bullet hole. The day of the murder, the cell phone found in the Camaro's trunk received a text message from a Decoto member containing the senior center's address. Multiple text messages were sent to that phone addressed to Villarreal as Norberto (his first name) or Daniel (the name he goes by). A firearm with Villarreal's DNA as the major profile was found in the getaway van. The year before Arreola's murder, a Hoggs member murdered Villarreal's cousin. Arreola was a high-ranking Hoggs member. "The compelling nature of this evidence leads us to conclude there is no 'reasonable chance' that the jury would have reached a different verdict" on the murder charge "had [Villarreal's] challenge to the . . . firearm evidence been sustained." (*Jefferson, supra*, 238 Cal.App.4th at p. 508.)

19

Villarreal's contention that the prosecution treated the Camaro firearm evidence as important is an overstatement. During closing argument, the prosecutor provided several examples to demonstrate the Camaro was always with Villarreal and was within his control. This included a statement that in June 2016, leading up to Villarreal's arrest, police conducting surveillance observed him in the Camaro several times, and when he was arrested, "he's in possession and control of that Camaro. His firearm is loaded and located there." While Villarreal gives this comment much import, this was the prosecutor's sole mention of the firearm found in the Camaro during the course of his 73-page closing argument. Villarreal points to no other reference the prosecutor made to this evidence. Further, the firearm was not the only evidence on which the prosecution relied to demonstrate Villarreal had control of the Camaro.

Villarreal contends the jury's 9-day deliberations, requests for witness testimony readback, and requests to view exhibits demonstrate it was a close case. Villarreal points to—but does not discuss—witness testimony and exhibits which the jury requested to review. This does not compel the conclusion, though, that the jury likely would have reached a different result absent the admission of the Camaro firearm evidence. We find it reasonable to conclude that the jurors requested the readback and exhibits to refresh their recollection of the evidence. This was a complicated trial involving two defendants charged with six counts based on four separate incidents. 47 witnesses testified and over 50 items of evidence were admitted. There were 14 days of trial before the jury, with a 2-week break in the middle. While we recognize that some courts have inferred a close case based on lengthy deliberations and requests for readback of testimony (see, e.g., *People v. Walker* (1995) 31 Cal.App.4th 432, 438–439; *People v. Diaz* (2014)

227 Cal.App.4th 362, 384–385), we cannot do so here. Instead, we conclude that the jury's requests and lengthy deliberations "could as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision." (*Walker*, at p. 439.)

We conclude it is not reasonably probable Villarreal would have obtained a more favorable result had the trial court excluded the Camaro firearm evidence, and therefore any assumed error in its admission was harmless.

## B. Section 1109

Villarreal contends that his murder conviction and the true findings on the gang-related enhancements must be reversed under section 1109. Section 1109 was added by Assembly Bill No. 333 (2021-2022 Reg. Sess.) and became effective in January 2022, after the verdict and before sentencing. (*People v. Burgos* (2024) 16 Cal.5th 1, 7, 9 (*Burgos*).) Section 1109 " 'requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.' " (*Burgos*, at p. 9.) Here, during the guilt phase of trial, there was no statutory requirement that a court bifurcate the trial of a gang enhancement from trial of the underlying offense. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1048.) Villarreal contends that section 1109 applies retroactively and therefore, pursuant to its bifurcation provisions, his conviction must be reversed because the underlying crimes were tried together with the gang enhancements. At the time of briefing, the parties disputed whether section 1109 applies retroactively.

In *Burgos*, the California Supreme Court recently decided this issue, holding that section 1109 does not apply retroactively. (*Burgos, supra,*

21

16 Cal.5th at p. 31.)[12]  Villarreal's reliance on section 1109 depends entirely on his proposition that section 1109 applies retroactively.  Because the Supreme Court has held it does not, Villarreal's claim fails.

## C. Cumulative Error

Villarreal contends the cumulative effect of the two claimed errors, *ante*, denied him of his due process right to a fair trial, requiring reversal of the judgment.  Because there has been no error, let alone a series of errors, there can be no cumulative error.  (See *People v. Hill* (1998) 17 Cal.4th 800, 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"]; *People v. Reed* (2018) 4 Cal.5th 989, 1018 ["Because we have found but one error—which was harmless—there is no prejudice to cumulate"].)

## D. Assembly Bill No. 333—Gang Enhancements

Villarreal contends that under Assembly Bill No. 333, the jury's true findings on the gang enhancement (§ 186.22, subd. (b)(5)) and the gang-related firearm enhancement (§ 12022.53, subd. (e)(1)) must be reversed because of retroactive amendments to section 186.22.  The People concede these true findings must be reversed and the case remanded to give them the opportunity to retry the allegations.

Assembly Bill No. 333 made changes to the law on gang enhancements under section 186.22.  (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.)  Among other things, it narrowed the definitions of " 'criminal street gang' " and " 'pattern of criminal activity,' " and it "narrowed what it means for an

---

[12] In their briefing—filed before the Supreme Court issued its opinion in *Burgos*—both sides acknowledged that the issue of section 1109's retroactivity was pending before the Supreme Court.  Villarreal conceded that "*Burgos* will be dispositive on this issue."

offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' " (*Ibid*.)  Assembly Bill No. 333 essentially added new elements to the section 186.22 enhancements.  (*Tran*, at p. 1207.)  "These changes have the effect of 'increas[ing] the threshold for' " the " 'imposition of the enhancement.' " (*Ibid*.)  These substantive changes, in turn, affected the gang-related firearm enhancement under section 12022.53, subdivision (e), which requires as a prerequisite a true finding on the gang enhancement under section 186.22.  (See § 12022.53, subd. (e)(1)(A).)  It is undisputed that the amendments to section 186.22 apply retroactively to Villarreal because his judgment is not yet final.  (*Tran*, at pp. 1206–1207.)

Because of the change in the law, the trial court's instructions did not convey the now-current requirements for the gang-related enhancements. Because the jury was "not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*People v. Tran, supra*, 13 Cal.5th at p. 1207.)  The People concede reversal given the shortcomings of the evidence presented at trial under the amended statute.

We accept the People's concession that the gang-related enhancements must be reversed.  They may be retried.  (*People v. Cooper* (2023) 14 Cal.5th 735, 746–747.)

### E.  Sentencing

The trial court sentenced Villarreal to 25 years to life in prison for the first degree murder conviction and a concurrent term of 25 years to life for the gang enhancement pursuant to section 186.22, subdivision (b)(5). Villarreal contends that the concurrent term for the gang enhancement

represents a legally unauthorized sentence which this court should correct. Given the People's concession—which we accepted—that the true findings on the gang enhancement must be reversed, we need not address this claim.

## III.   DISPOSITION

The judgment is reversed as to the true findings on the section 186.22, subdivision (b)(5) and section 12022.53, subdivision (e)(1) gang enhancement allegations.  In all other respects, the judgment is affirmed.  On remand, the People may elect to retry the gang enhancement findings under the law as amended by Assembly Bill No. 333.

LANGHORNE WILSON, J.

WE CONCUR:

BANKE, ACTING P. J.

SIGGINS, J.[*]

A166603
*People v. Villarreal*

---

[*] Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25